# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
## APPEAL NO. 14-1745, 14-1756

---

### JOSEPH TRAVERS,

**Plaintiff - Appellee/Cross-Appellant**

**v.**

### FLIGHT SERVICES & SYSTEMS, INC.,

**Defendant-Appellant/Cross-Appellee**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
### Case No. 11-CV-10175
### The Honorable Richard G. Stearns

---

## BRIEF OF PLAINTIFF-APPELLEE/CROSS-APPELLANT

---

**Shannon Liss-Riordan (C.A.B. 77877)**
**LICHTEN & LISS-RIORDAN, P.C.**
**729 Boylston Street, Suite 2000**
**Boston, Massachusetts 02116**
**Telephone: (617) 994-5800**

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES ..................................................................1

STATEMENT OF THE CASE ......................................................................2

STATEMENT OF FACTS ............................................................................4

SUMMARY OF THE ARGUMENT .............................................................9

ARGUMENT .............................................................................................. 14

I.    Standard of Review. ............................................................................ 14

II.   The District Court Properly Upheld the Jury's Verdict for
      Plaintiff. ............................................................................................ 15

      A.    Plaintiff Was Not Limited To Arguing That Robert
            Weitzel's Animus Against Travers Was the Reason for
            His Termination. ...................................................................... 16

      B.    Plaintiff Presented More Than Sufficient Evidence From
            Which the Jury Could Infer Retaliatory Animus. .................... 19

            1.    FSS did not have a strict policy by which an
                  allegation of tip solicitation automatically resulted
                  in termination. .............................................................. 21

            2.    Other FSS skycaps accused of tips solicitation
                  received lesser, if any, discipline. ................................ 25

            3.    The comparators offered by FSS who were
                  terminated for tip solicitation had engaged in
                  conduct far more egregious than Travers. ..................... 30

            4.    The jury could have concluded that Sarah Collier
                  had her own retaliatory animus against Travers. ........... 34

      C.    Travers' Testimony about Weitzel's Statements was
            Properly Admitted and the District Judge's Subsequent
            Ruling that the Testimony was Inadmissible Hearsay was
            Error. ....................................................................................... 39

III.    The District Court Properly Upheld the Jury's Award of Back Pay Damages. ................................................................... 41

IV.    The District Court's Remitted Award of Emotional Distress Damages of $50,000 Was Proper. ...................................... 47

V.     The District Court's Award of Attorneys' Fees & Costs Was Proper ..................................................................................... 50

VI.    The District Court Erred In Striking All Front Pay Damages In Their Entirety ................................................................... 56

VII.   The District Court Erred in Refusing to Treble Damages for Emotional Distress (And For Front Pay, Which Should Not Have Been Eliminated) ....................................................... 61

VIII.  The District Court Erred in Failing to Award Prejudgment Interest. ........................................................................... 65

CONCLUSION ............................................................ 68

# TABLE OF AUTHORITIES

## Cases

Agoos Leather Cos. v. Am. & Foreign Ins. Co.,
   342 Mass. 603 (1961) ................................................................ 59

Allenson v. Sch. Comm. of Norton,
   66 Mass. App. Ct. 1117 (2006)........................................... 56, 66

Am. Legion Post 12 v. Susa,
   2005 WL 3276210 (R.I. Super. Ct. Nov. 30, 2005) ................ 43

Analysis Grp., Inc. v. Cent. Florida Investments, Inc.,
   629 F.3d 18 (1st Cir. 2010)...................................................... 15

Anderson v. Home Depot U.S.A., Inc.,
   2004 WL 42569 (D. Mass. Jan. 8, 2004)................................. 38

Aponte-Rivera v. DHL Solutions (USA), Inc.,
   650 F.3d 803 (1st Cir. 2011).................................................... 15

Ardingo v. Local 951, United Food And Commercial Workers Union,
   333 Fed. App'x 929 (6th Cir. 2009) ........................................ 60

Atl. Limousine, Inc. v. N.L.R.B.,
   243 F.3d 711 (3d Cir. 2001) .................................................... 42

Awuah v. Coverall North America, Inc.,
   460 Mass. 484 (2011) .............................................................. 63

Bennett v. City of Holyoke,
   362 F.3d 1 (1st Cir. 2004)........................................................ 66

Bielunas v. F/V Misty Dawn, Inc.,
   621 F.3d 72 (1st Cir. 2010)...................................................... 45

Boston Pub. Health Comm'n v. Massachusetts Comm'n Against
   Discrimination, 67 Mass. App. Ct. 404 (2006) ........................ 49

Bryant v. Aiken Reg'l Med. Centers Inc.,
   333 F.3d 536 (4th Cir. 2003) ................................................... 29

Chiappetta v. Lyons,
    1999 Mass. App. Div. 276 (Dist. Ct. 1999)............................................. 62

Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas
    Municipio, 754 F.3d 17 (1st Cir. 2014)................................................... 47

Connolly v. Harrelson,
    201 F.3d 426 (1st Cir. 1999)............................................................. 14, 51

Cook v. Patient Edu. LLC,
    465 Mass. 548 (2013) ............................................................................ 63

DeSantis v. Commonwealth Energy Sys.,
    68 Mass. App. Ct. 759 (2007)................................................................. 67

DiFiore v. American Airlines,
    454 Mass. 486 (2009) ............................................................................ 63

Foley v. City of Lowell, Massachusetts,
    948 F.2d 10 (1st Cir. 1991)..................................................................... 66

Fontaine v. Ebtec Corp.,
    415 Mass. 309 (1993) ............................................................................ 62

Fraelick v. PerkettPR, Inc.,
    83 Mass. App. Ct. 698 (2013)........................................................... 62, 64

Fryer v. A.S.A.P. Fire & Safety Corp.,
    2010 WL 3191785 (D. Mass. Aug. 12, 2010) ......................................... 47

Gilman v. Kessler,
    192 Ill.App.3d 630 (1989) ...................................................................... 52

Gray v. City of Montgomery,
    756 F. Supp. 2d 1339 (M.D. Ala. 2010)................................................. 38

Haddad v. Wal-Mart Stores, Inc.,
    455 Mass. 91 (2009) ......................................................................... 13, 60

Haddad v. Gonzalez,
    410 Mass. 855 (1991) ............................................................................ 62

Handrahan v. Red Roof Inns, Inc.,
   43 Mass. App. Ct. 13 (1997)......................................................... 56

Howe v. Fiduciary Trust Co.,
   13 Mass. L. Rep. 125 (Mass. Super. Ct. 2001)......................................... 41

Jennings v. Jones,
   587 F.3d 430 (1st Cir. 2009)............................................................ 14, 33

Kelley v. Airborne Freight Corp.,
   140 F.3d 335 (1st Cir. 1998)................................................. 57, 59, 62, 65

Knight v. Avon Products, Inc.,
   438 Mass. 413 (2003) .................................................................... 19

Koster v. Trans World Airlines, Inc.,
   181 F.3d 24 (1st Cir. 1999)............................................................... 48

Krewson v. City of Quincy,
   74 F.3d 15 (1st Cir. 1996).............................................................. 53

Lane v. McKeithen,
   423 F. App'x 903 (11th Cir. 2011)..................................................... 29

Leidel v. Ameripride Servs., Inc.,
   276 F. Supp. 2d 1138 (D. Kan. 2003).................................................. 46

Linthicum v. Archambault,
   379 Mass. 381 (1979) .................................................................. 51

Marchant v. Dayton Tire & Rubber Co.,
   836 F.2d 695 (1st Cir.1988)............................................................ 50

Matamoros v. Starbucks,
   699 F.3d 129 (1st Cir. 2012)........................................................ 61, 67

McDonough v. City of Quincy,
   452 F.3d 8 (1st Cir. 2006)............................................................. 49

McEvoy Travel Bureau, Inc. v. Norton Co.,
    408 Mass. 704 (1990) ......................................................... 66, 67

Melia v. Zenhire, Inc.,
    462 Mass. 164 (2012) ............................................................. 65

Mesnick v. Gen. Elec. Co.,
    950 F.2d 816 (1st Cir. 1991)................................................... 38

Mori-Noriega v. Antonio's Rest., Inc.,
    923 F.2d 839 (1st Cir. 1990)................................................... 42

Negron-Almeda v. Santiago,
    579 F.3d 45 (1st Cir. 2009)..................................................... 17

Ogden v. Wax Works, Inc.,
    29 F. Supp. 2d 1003 (N.D. Iowa 1998) ................................... 59

Poulis-Minott v. Smith,
    388 F.3d 354 (1st Cir. 2004)............................................. 14, 39

Powell v. Alexander,
    391 F.3d 1 (1st Cir. 2004)....................................................... 45

Powell v. City of Pittsfield,
    221 F. Supp. 2d 119 (D. Mass. 2002)...................................... 45

Pritchett v. Warrender,
    546 F. App'x 66 (3d Cir. 2013)................................................ 17

Pyramid Life Ins. Co. v. Curry,
    291 F.2d 411 (8th Cir. 1961) .................................................. 17

Ramirez-De-Arellano v. Am. Airlines, Inc.,
    133 F.3d 89 (1st Cir. 1997)..................................................... 38

Rathbun v. Autozone, Inc.,
    361 F.3d 62 (1st Cir. 2004)..................................................... 19

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) ..................................................................... 10, 34, 37

Rodriguez-Torres v. Caribbean Forms Mfr., Inc.,
    399 F.3d 52 (1st Cir. 2005) ...................................................................... 48

Rosnov v. Malloy,
    460 Mass. 474 (2011) .............................................................................. 61

Rossello-Gonzalez v. Acevedo-Vila,
    483 F.3d 1 (1st Cir. 2007) ........................................................................ 51

Salvi v. Suffolk Cnty. Sheriff's Dep't,
    67 Mass. App. Ct. 596 (2006) .................................................................. 66

Sch. Comm. of Norton v. Massachusetts Comm'n Against
    Discrimination, 63 Mass. App. Ct. 839 (2005) ........................................ 56

Selgas v. Am. Airlines, Inc.,
    104 F.3d 9 (1st Cir. 1997) ........................................................................ 57

Smith v. Winter Place LLC,
    447 Mass. 363 (2006) .............................................................................. 64

Srebnick v. Lo-Law Transit Mgmt., Inc.,
    29 Mass. App. Ct. 45 (1990) .................................................................... 41

Stoner v. State Farm Mut. Auto. Ins. Co.,
    856 F.2d 1195 (8th Cir. 1988) ................................................................. 17

Tevelson v. Life & Health Ins. Co. of Am.,
    643 F. Supp. 779 (E.D. Pa. 1986) ............................................................ 45

Trainor v. HEI Hospitality, LLC,
    699 F.3d 19 (1st Cir. 2012) ......................................................... 47, 48, 50

Travers v. Flight Servs. & Sys., Inc.,
    737 F.3d 144 (1st Cir. 2013) .............................................................. passim

Travers v. JetBlue Airways Corp. and Flight Services & Systems, Inc.,
   CIV. A. No. 08-10730, 2010 WL 3835029 (D. Mass. Sept. 30, 2010)...... 2

U.S. v. N.J.,
   530 F. Supp. 328 (D.N.J. 1981) .................................................................. 45

United States v. Cruz-Kuilan,
   75 F.3d 59 (1st Cir. 1996) ........................................................................... 12

Valm v. Hercules Fish Products, Inc.,
   701 F.2d 235 (1st Cir. 1983) ....................................................................... 14

Ventresco v. Liberty Mut. Ins. Co.,
   55 Mass. App. Ct. 201 (2002) ..................................................................... 66

Vera-Lozano v. Int'l Broad.,
   50 F.3d 67 (1st Cir. 1995) ........................................................................... 57

Walsh v. Carney Hosp. Corp.,
   1998 WL 1470698 (Mass. Super. June 10, 1998) ........................ 56, 58, 60

WBIP, LLC v. Kohler Co.,
   2014 WL 585854 (D. Mass. Feb. 12, 2014) ............................................... 50

Weber v. Cmty. Teamwork, Inc.,
   434 Mass. 761 (2001) ........................................................................... 13, 60

Weber v. Coast to Coast Med., Inc.,
   83 Mass. App. Ct. 478 (2013) .............................................................. 64, 67

White v. New Hampshire Dep't of Corr.,
   221 F.3d 254 (1st Cir. 2000) ....................................................................... 14

Witty v. Dukakis,
   3 F.3d 517 (1st Cir. 1993) ........................................................................... 53

Woodman v. Haemonetics Corp.,
   51 F.3d 1087 (1st Cir. 1995) ....................................................................... 41

## Statutes

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

29 U.S.C. §215 (a)(3) ............................................................................ 1, 2

M.G.L. c. 149 §150 ............................................................................ passim

M.G.L. c. 149 §148A .................................................................. 2, 62, 64, 65

M.G.L. c. 151B, § 9 ................................................................................. 62

M.G.L. c. 231 § 6C ....................................................................... 2, 13, 65

## Rules

Fed. R. Civ. P. 59 .................................................................................... 14

Fed. R. Evid. 408(a) ............................................................................... 54

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Plaintiff brought a claim under the federal Fair Labor Standards Act, 29 U.S.C. §215 (a)(3). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, because this is an appeal from a final judgment entered by the District Court on August 15, 2014, that fully disposed of all of the claims of the parties. FSS Add. 26. Plaintiff's cross-appeal is timely under Rule 4(a) of the Federal Rules of Appellate Procedure, because Plaintiff filed his Notice of Cross-Appeal with the District Court on August 19, 2014, (J.A. 1639), within 30 days of the entry of final judgment.

## STATEMENT OF THE ISSUES

1. Did the District Court properly deny FSS's Motion for Judgment as a Matter of Law at the close of Plaintiff's evidence and uphold the jury's verdict?

2. Did the District Court properly uphold the jury's award of back pay damages in the amount of $90,000 (trebled to $270,000) and emotional distress damages in a remitted amount of $50,000?

3. Did the District Court properly decline to reduce or eliminate the award of attorneys' fees?

4. Did the District Court err in eliminating front pay damages, which were properly determined by the jury based on the evidence presented?

5. Did the District Court err in refusing to treble all damages, including emotional distress damages and front pay, where Mass. Gen. L. c. 149 § 150 requires mandatory trebling of "any lost wages and other benefits"?

6. Did the District Court err in failing to award pre-judgment interest despite the mandatory language of Mass. Gen. Laws c. 231 § 6C?

## STATEMENT OF THE CASE

Appellee/Cross-Appellant Joseph Travers filed this action on January 31, 2011, alleging that Defendant Flight Services and Systems, Inc. ("FSS") retaliated against him by terminating him because of his participation and leadership in a class action lawsuit against the company, in violation of 29 U.S.C. §215(a)(3) and Mass. Gen. L. ch. 149 §148A. J.A. 25-29. Specifically, Travers alleged that after he served as the lead named plaintiff in a lawsuit filed against FSS and JetBlue in 2008, challenging a $2 per-bag fee that JetBlue imposed for the curbside check-in services provided by skycaps like himself, see Travers v. JetBlue Airways Corp. and Flight Services & Systems, Inc., CIV. A. No. 08-10730, 2010 WL 3835029 (D.

2

Mass. Sept. 30, 2010) ("JetBlue case"), FSS suspended and then terminated

him. J.A. 25-29.  By the time of his termination in September 2010, Travers

had been deposed and submitted multiple affidavits in support of the JetBlue

case and had been actively involved in encouraging other skycaps to

participate in the case and discouraging skycaps from dropping out of the

case.  J.A. 27, 349-55, 614:20-22.  As pretext for his unlawful termination,

FSS cited an alleged incident of "tip solicitation."

FSS moved for summary judgment in July 2012. J.A. 88.  On March

7, 2013, the District Court granted FSS's motion and Plaintiff appealed.

J.A. 491.  This Court reversed the District Court's grant of summary

judgment to FSS, finding that "there remains a genuine dispute as to . . .

whether Travers would have been fired anyway for reasons other than

pursuit of his rights under the FLSA." Travers v. Flight Servs. & Sys., Inc.,

737 F.3d 144, 150 (1st Cir. 2013).  The case proceeded to trial in March

2014.  J.A. 525.  After a five day trial, the jury returned a verdict in favor of

Plaintiff, finding that Travers was terminated for "his participation in the

lawsuit against Jet Blue Airways and FSS" and that "the termination of [his]

employment by FSS [was] a substantial . . . cause of the injury and damages

to him." J.A. 1305.  The jury awarded Travers $90,000 in back pay,

$450,000 in front pay, and $400,000 in emotional distress damages. The

District Court later ordered a remittitur of the emotional distress damages from $400,000 to $50,000, which Travers accepted. J.A.1422, 1478. The District Court also struck the jury's front pay award altogether. J.A. 1478. The District Court then entered final judgment for Travers for $90,000 in back pay (which the Court trebled) and $50,000 in emotional distress (which it failed to treble) for a total of $320,000. J.A. 1636. The Court also awarded attorneys' fees and costs in the amount of $183,583.45 but did not award interest. FSS Add. 26, J.A. 1608. FSS appealed the Court's upholding of the verdict and the award of attorneys' fees, J.A. 1637, and Travers cross-appealed the Court's elimination of his front pay award, failure to treble all damages, and failure to award prejudgment interest. J.A. 1639.[1]

## STATEMENT OF FACTS

Joseph Travers worked as a skycap for FSS, helping customers with their baggage and facilitating check-in outside the airport on the curb. J.A. 596:23-597:9. Skycaps are tipped employees, meaning they are paid $2.63 per hour and earn the rest of their income from customer tips. J.A. 601:5-8. FSS contracts with JetBlue Airlines to provide skycap services, as well as

---

[1]    The Joint Appendix omitted Plaintiffs' motion and reply on fees, interest, and trebling and thus these documents are part of the addendum to Apellee/Cross-Appellant's Brief.

wheelchair, security and other airport services.  J.A. 596:17-22.  Travers

began working as a skycap providing services for JetBlue through FSS in

early 2004. J.A. 695:3-8.  Travers excelled at this work: he was made the

"lead skycap" and given the responsibility of training his coworkers on new

policies and equipment and helping newly hired skycaps learn the ropes.

J.A. 597:10-18, 598:17-22.

Beginning in 2008, a charge of $2 per bag was added for use of the

skycap service, which had previously been free for customers.  J.A. 601:23-

602:5.  Travers presented testimony that many customers were confused by

the new fee: some believed the fee was going to the skycaps and thus did not

leave tips on top of the charge.  J.A. 603:1-20.  Overall, the skycaps' tips

suffered. J.A. 604:4-20.  In response to these changes, Travers did his own

research and eventually contacted Plaintiffs' counsel about pursuing legal

action regarding the charge. J.A. 608:5-609:5.  After he contacted Attorney

Liss-Riordan he organized a meeting with her and the other skycaps; and as

a result of that meeting, the skycaps filed a class action lawsuit challenging

the $2 fee.  J.A. 610:1-7.

The evidence at trial showed that, in addition to initiating the case,

Travers remained a prominent figure throughout the litigation challenging

the $2 fee.  He encouraged co-workers to join the lawsuit and served as the

principal contact for plaintiffs' counsel, often conveying updates to the other skycaps regarding the litigation. J.A. 572:14-18, 573:1-7, 712:5-8, 836:10-13. He was the first plaintiff to be deposed and submitted two affidavits in support of motions filed by the plaintiffs, and because he was the first named plaintiff in the case, the lawsuit bore his name: <u>Travers, et al. v. JetBlue Airways Corp. and Flight Services & Systems, Inc.</u> J.A. 614:20-22, 349-55.

Management knew about Travers' role as a leader in the lawsuit. J.A. 991:1-4; J.A. 870:3-14. Former FSS supervisor Nabil Agba testified that it was "clear that he was the leader" of the lawsuit. J.A. 991:1-4. Furthermore, Travers testified that at work his supervisor at the time, Rob Nichols, told him that the lawsuit was frequently discussed on conference calls with FSS management, which included HR Director Sarah Collier and the owners of the company, Robert and Bobby Weitzel. J.A. 617:14-619: 25, 884:20-885:4. On these calls, the Weitzels complained about the cost of the lawsuit and expressed a desire to "get rid of Travers." J.A. 619:8-620:2.[2] Collier

---

[2]    Travers' testimony regarding his conversations with Nichols was later ruled inadmissible by the trial court but for the reasons explained, <u>infra</u> Part II.C, this ruling was in error and the testimony was properly admitted. Plaintiff cross-appealed the Court's ruling that this evidence was improperly admitted. J.A. 1639. Travers testified that his conversations with Nichols took place at work on the curb, but he mistakenly stated at one point in his testimony that they occurred in the "early summer of 2010." J.A. 619:8-9. In fact, Nichols was terminated in the spring of 2010. Travers later clarified in his testimony that the conversations took place while Nichols was still

further testified that she was the FSS representative in charge of coordinating the company's defense against the underlying lawsuit, was responsible for minimizing the costs of the lawsuit, and knew that Travers was the lead plaintiff and organizer of other skycaps in the lawsuit. J.A. 887:10-893:11.  Finally, Agba also testified that shortly after Travers was terminated, FSS managers discussed how they would win the lawsuit by convincing each skycap individually to drop out. J.A. 995:4-996:22.  Indeed, during the months after Travers' termination, plaintiffs began dropping out of the case. Id.

On September 27, 2010, not long after being deposed in the increasingly contentious case, Travers was suspended based on an allegation of "tip solicitation."  J.A. 614:20-24.  FSS alleges that Travers had violated company policy by telling a passenger "Tip is optional, like in a restaurant." FSS Br. at 10-11.  At trial, Travers testified that at the time, he told FSS management that he told the customer what he routinely told customers:

---

working for FSS, stating:  "I apologize. It was probably the spring of 2010. It was right before he was terminated.  But I know I had a conversation with him, and he was at the curb every day . . .  I didn't know the exact date of his termination." J.A. 640:7-14.  The jury could reasonably believe that Travers simply mixed up the dates of a conversation that took place four years earlier and which he consistently testified occurred at work.  Thus, the District Court improperly held this testimony inadmissible on the ground that Nichols was no longer employed at the time he made the comments.

that, "A tip is optional," and that he made the comparison to a restaurant in response to her confusion, but that he did not engage in any improper conduct. J.A. 623:17-624:10.  Indeed, FSS management testified at trial that skycaps were allowed to say what was on the curbside signage: "Tipping is optional but greatly appreciated." J.A. 897:10-18.

Moreover, the evidence at trial showed that other skycaps who were accused of tip solicitation were not fired and instead received lesser discipline, if any discipline. See infra, pp. 28-30.  At trial FSS tried to justify these differences by saying, for example, that the customer complaint in these other cases came from a family member of the passenger, rather than directly from a passenger, but evidence at trial supported the inference that such a distinction was an after-the-fact justification. FSS Br. at 14, 31-32; J.A. 913:25-915:16.  Furthermore, the few instances in which FSS employees were actually terminated for conduct that included tip solicitation involved far more egregious misconduct and much clearer violations of policy, such as wheeling a passenger to an ATM machine and demanding a tip, or reaching into the bag of passenger in a wheelchair and trying to take a tip. See infra, pp. 31-32.

Furthermore, the evidence at trial supported the inference that the company's three week "investigation" of the allegation against Travers was

8

a sham and that the company did not take basic efforts to locate the aggrieved customer and uncovered no corroborating evidence from Travers' co-workers who were present. J.A. 746:17-747:6; 742:16-743:9.[3]  Travers testified to how much he loved his job, and that he planned to stay there another twenty years.  See J.A. 632:8-12; 629:5-23.  However, ultimately, Collier testified that she exercised her discretion and "ma[de] a judgment" that Travers should be terminated, and he was fired from his job at FSS in late September.  J.A. 898:3-8, 908:18-909:2.

## SUMMARY OF THE ARGUMENT

Plaintiff Travers proved his case at trial by presenting evidence to the jury that he had played a lead role in a class action wage lawsuit against his employer FSS, that FSS management knew of his role in the lawsuit and targeted him because of it, and that FSS terminated him in retaliation for his protected conduct. Travers further presented evidence that FSS's proffered reason for his termination was pretext, as other FSS employees accused of similar alleged misconduct were not terminated and received lesser

---

[3]    In fact, it is not even clear that the customer's complaint was about Travers because Travers testified that the customer he recalls having an interaction was someone of average height with straight hair whereas the JetBlue representative described the customer as a short woman with scrunchy hair. J.A. 1078:25-1079:2; 1090:24-1091:2; 1093:21-23.

discipline (if any), while those few who were terminated for "tip solicitation" engaged in far more egregious conduct. Based on this evidence and all of the evidence presented at trial, the jury found in Travers' favor.

Notwithstanding FSS's best efforts, it has failed to demonstrate that a reversal of the jury's verdict is merited. Although FSS argues that the evidence is "undisputed" that tip solicitation is a terminable offense and that Travers admitted to it, this is simply not true. Indeed, the jury was free to assess the credibility of the witnesses at trial and to disbelieve the post hoc justifications that FSS drew between Travers and other comparators who were not fired for allegations of tip solicitation.

FSS now asks this Court to impermissibly disregard the jury's verdict and to make credibility determinations in Defendant's favor. However, as the Supreme Court has repeatedly held, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (reversing grant of judgment as a matter of law because the court had "impermissibly substituted its judgment concerning the weight of the evidence for the jury's") (quotations omitted). Here, this Court has already held that "a reasonable jury could return a verdict for Travers without relying on

10

improbable inferences or unsupported speculation." Travers v. Flight Servs.
& Sys., Inc. ("Travers I"), 737 F.3d 144, 145 (1st Cir. 2013).

FSS suggests that in fact, this Court's decision in Travers I, somehow
limits Plaintiff through the "law of the case" doctrine to presenting only
evidence at trial that he presented in opposing summary judgment.  FSS
argues that the exclusion of Nichols' comments about Weitzel wanting to
"get rid of Travers" therefore dooms the verdict in Plaintiffs' favor. J.A.
619:8-620:2.   However, Plaintiff was not limited at trial by the record on
summary judgment and was free to produce additional, new evidence of
retaliatory animus.  To hold otherwise would yield an absurd result,
essentially punishing Plaintiff for putting on a stronger case at trial than in
opposing summary judgment. The jury was free to credit all the other
evidence of retaliation Plaintiff presented and their finding should not be
disturbed.[4]

Consistent with this Court's decision in Travers I, the jury's verdict
reflects a reasonable interpretation of the evidence. "Credibility
determinations are uniquely within the jury's province, and [the Court]
defer[s] to the jury's verdict if the evidence can support varying inferences."

---

[4]     For example, Plaintiff presented ample evidence that Sarah Collier,
HR Director, also harbored retaliatory animus against Travers and exercised
her discretion to fire him. See infra, Part II.B.4., pp. 34-38.

United States v. Cruz-Kuilan, 75 F.3d 59, 62 (1st Cir. 1996).  Here, the jury

assessed witness credibility and concluded that Travers was the victim of

unlawful retaliation.  This Court should heed its prior ruling and the jury's

reasoned judgment, and should deny FSS's request for judgment as a matter

of law, a new trial, or to amend the judgment.

Likewise, the Court should uphold the jury's award of $90,000 in

back pay and the already remitted $50,000 emotional distress award.  Finally

FSS's attack on Plaintiffs' counsel and the award of attorneys' fees in this

case is unfounded and was properly rejected by the District Court, which

correctly found "none of these alleged transgressions . . . rose to the level of

a sanctionable breach of professional ethics," and that "the number of hours

expended and the tasks indicated [are] very reasonable given a heavily

litigated case that involved an appeal and culminated in a five-day jury

trial." FSS Add. 22, 24.

However, the District Court erred when it summarily struck the jury's

entire award of $450,000 in front pay as "speculative." J.A. 1448.  The

District Court erroneously ruled that "the jury had before it only plaintiffs

estimate that he would have lost $25,000 yearly over some 30 years of future

employment at FSS" and that "on this testimony a 30-year award (or any

award at all) cannot be sustained."  FSS Add. 16.  First, the jury's award was

12

based on a 20 year estimate, not a 30 year estimate. <u>See</u> <u>supra</u>, Part IV.

Moreover, as the District Court acknowledged, the jury *did* receive evidence

that Travers intended to stay in this job until retirement, that other skycaps

kept these jobs for many years (even decades), and that he lost income after

his termination  (on the order of $25,000 per year) that he had not been able

to recoup. J.A. 632:8-12, 703:15-17, 636:22-24.  All these facts support the

jury's award of front pay.[5]  Indeed, front pay is always speculative to some

degree, but courts uphold it when based on evidence, similar to what was

presented at trial here. <u>See</u>, <u>e.g.</u>, <u>Haddad v. Wal-Mart Stores, Inc.</u>, 455 Mass.

91, 102 (2009); <u>Weber v. Cmty. Teamwork, Inc.</u>, 434 Mass. 761, 763

(2001).  Likewise, the District Court erred in failing to award mandatory

prejudgment interest as required by law, <u>see</u> M.G.L. c. 231 § 6C, and in

failing to treble emotional distress (and the stricken front pay damages), as

required by M.G.L c. 149 §150.  These aspects of the District Court's Order

should be reversed.

---

[5]      If the District Court felt the jury's award was grossly excessive it may
have remitted it, but instead, the Court *struck the award entirely*, which was
a clear abuse of discretion.

# ARGUMENT

## I.    Standard of Review.

Courts review "denial of [the] defendant's motions for judgment as a matter of law de novo," examining "evidence and inferences therefrom in the light most favorable to the plaintiff." White v. New Hampshire Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000). The Court should "reverse only if a reasonable person could not have reached the conclusion of the jury" and should not "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Id.

Denial of a Fed. R. Civ. P. 59 motion is reviewed for abuse of discretion. Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009). The Court owes "deference to the trial court's determination," in recognition of the fact that "Circuit judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial." Id. at 437. Thus, "the jury's verdict [must be] so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice." Valm v. Hercules Fish Products, Inc., 701 F.2d 235, 237 (1st Cir. 1983).

Evidentiary rulings are reviewed for abuse of discretion. Poulis-Minott v. Smith, 388 F.3d 354, 357 (1st Cir. 2004). Likewise, courts review "an award of attorneys' fees for abuse of discretion," Connolly v. Harrelson,

14

201 F.3d 426 (1st Cir. 1999), and an award of prejudgment interest for abuse of discretion. Analysis Grp., Inc. v. Cent. Florida Investments, Inc., 629 F.3d 18, 24 (1st Cir. 2010). A damages award is overturned only "if it is grossly excessive or so high as to shock the conscience." Aponte-Rivera v. DHL Solutions (USA), Inc., 650 F.3d 803, 810 (1st Cir. 2011). "Where the trial court already has invoked its discretion in granting a remittitur, the scope of review is even narrower than usual." Id. at 810-11.

## II.    The District Court Properly Upheld the Jury's Verdict for Plaintiff.

Defendant asks the Court to engage in its own fact-finding. FSS alleges that "[f]rom the procedural history of this case, it is clear that there never would have been a trial without Nichols' anticipated testimony" and that "[a]t trial there was no other evidence of retaliatory animus" apart from the information Nichols relayed to Travers. FSS Br. at 20. Thus, it contends that the verdict must be set aside in the absence of Nichols' testimony. This argument is wrong for three separate reasons.

First, Plaintiff was not limited to only presenting evidence and argument presented in opposing summary judgment – that CEO Robert Weitzel wanted Travers fired for his involvement in the suit and made that known to his supervisor, Robert Nichols, and others. Contrary to FSS's

15

contentions, the absence of Nichols' testimony does not affect the verdict where other significant evidence of retaliatory animus clearly supported the jury's finding. Second, Plaintiff presented ample evidence of disparate treatment of other employees as well as evidence from which the jury could infer that Director of HR Sarah Collier acted with retaliatory animus in firing Travers. The District Court properly held that this evidence was sufficient to support the jury's verdict. FSS Add. at 18. To suggest that "there was no other evidence of retaliatory animus" presented at trial, apart from Nichols' statements about Weitzel, is simply false. Finally, Travers' testimony regarding Nichols' statements *was* admissible and the District Court erred in later reversing and ruling otherwise. Thus, although Plaintiff presented other evidence sufficient to demonstrate FSS's retaliatory motive, Travers' testimony about Nichols' statements was also properly admitted. For all these reasons, the jury's verdict in this case should stand.

### A. Plaintiff Was Not Limited To Arguing That Robert Weitzel's Animus Against Travers Was the Reason for His Termination.

Defendant suggests that under the "law of the case" doctrine, Plaintiff is somehow limited by the record on summary judgment to showing that CEO Weitzel harbored retaliatory animus towards Plaintiff, and communicated his desires to the FSS employees who fired Travers.

16

However, the "law of the case" doctrine is inapplicable here, and would yield absurd results, essentially punishing Plaintiff for putting on a stronger case at trial than in opposing summary judgment.  "Under the law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Negron-Almeda v. Santiago, 579 F.3d 45, 50 (1st Cir. 2009).  However, "denial of summary judgment d[oes] not create law of the case" where the court has simply ruled that genuine disputes of fact exist, precluding summary judgment. Pritchett v. Warrender, 546 F. App'x 66, 68 (3d Cir. 2013) (where the District Court later ruled "on a different and more complete record than the one on which it denied summary judgment," its earlier "denial of summary judgment did not create law of the case …").

At the same time, a court's reversal of summary judgment based upon genuine disputes of fact does not create "law of the case" that only those facts can be presented at trial.  "The law of the case rule does not apply if the evidence on the later trial is substantially different from that on the former trial." Pyramid Life Ins. Co. v. Curry, 291 F.2d 411, 414 (8th Cir. 1961). This makes sense, since weighing of the evidence at the summary judgment stage cannot dictate the result at a later trial where different evidence is presented.  Thus, for example, in Stoner v. State Farm Mut. Auto. Ins. Co.,

17

856 F.2d 1195, 1197 (8th Cir. 1988), the Eight Circuit reversed the district court's award of summary judgment for Defendant and remanded the case for trial.  When the Plaintiff later appealed the jury's decision, the Appeals Court noted that its earlier reversal of summary judgment did not constitute the law of the case for subsequent proceedings on remand because *"in examining the propriety of the district court's grant of summary judgment, [the Appeals Court] was limited to examining whether genuine issues of material fact existed for trial"* and therefore the "court's statements . . . were not 'the decision on former appeal,' but were, rather, a discussion of the evidence." Id.

Likewise, this Court's prior ruling denying summary judgment and finding a "genuine dispute" of fact did not in any way limit the evidence that Plaintiff could present at trial. Travers I, 737 F.3d at 150.  Instead, the "court's statements . . . [were] a discussion of the evidence." 856 F.2d at 1197.  This Court's discussion of the evidence in Travers I did not constitute "the law of case" at the later trial where different evidence was presented and the jury assessed the credibility of live witnesses.  Plaintiff was not limited to arguing only the exact same facts and theory at trial as he did in opposing summary judgment, and thus, Plaintiff was not limited to relying on Nichols' testimony to prove retaliatory animus.

### B. Plaintiff Presented More Than Sufficient Evidence From Which the Jury Could Infer Retaliatory Animus.

In reversing summary judgment for FSS, this Court acknowledged that "it remains plausible that [] pre-existing retaliatory motive tipped the scales when the company decided whether Travers had violated company policy in a way that required his termination." Travers I, 737 F.3d at 148. At trial, Plaintiff presented ample evidence even apart from Nichols' statements from which a jury could infer that Travers was indeed fired for retaliatory reasons. Plaintiff demonstrated that: (1) FSS did not have a strict policy by which an allegation of tip solicitation automatically resulted in termination, J.A. 817:3-18, 908:18-902:2; (2) other FSS skycaps accused of tip solicitation received lesser, if any, discipline, see e.g., J.A. 721:6-724:4, 1008:11-1009:18, 1221; and (3) the comparators offered by FSS had engaged in conduct far more egregious than Travers, J.A. 922:6-928:9

A jury may "infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision, [even] in the absence of direct evidence that the actual motivation was [retaliation]." Knight v. Avon Products, Inc., 438 Mass. 413, 422 (2003); see also Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004)("[T]he trier may infer the ultimate fact of discrimination from

19

components of the plaintiff's prima facie showing combined with compelling proof of the pretextual nature of the employer's explanation"). Here, there was convincing evidence that FSS's reason for firing Travers was false and the jury was permitted to infer animus even without the "direct evidence" of Weitzel's comments.

Furthermore, Plaintiff presented evidence from which the jury could infer that Collier, FSS's HR Director, had her own retaliatory bias against Travers when she approved his termination. Indeed, she was the company representative involved in the underlying lawsuit on behalf of FSS and she testified that she was responsible for saving the company money and defeating such lawsuits. J.A. 867:11-15, 889:12-894:25. She also admitted to having discretion to determine whether someone accused of tip solicitation would ultimately be fired. J.A. 908:15-909:5. In denying Defendant's Rule 50 motion, the District Court agreed.[6] Thus, the jury had

---

[6] The District Court chose to grant remittitur and uphold the jury's verdict even after it erroneously found the testimony about Weitzel's statements to Nichols was hearsay. FSS Add. 16, 18. Thus, the District Court clearly found that there was enough evidence, even without Nichols' testimony, from which the jury could infer retaliatory motive. J.A. 1477 ("After consideration . . . and having reviewed the testimony of [] Collier, the court stands by its various rulings…"). Unlike this Court, the District Court had the benefit of assessing the credibility of live witnesses.

more than enough evidence to find that FSS retaliated against Travers, with or without the testimony regarding Weitzel's comments to Nichols.

### 1. FSS did not have a strict policy by which an allegation of tip solicitation automatically resulted in termination.

FSS emphasizes that "tip solicitation is a terminable offense at FSS." FSS Br. at 27. However, the evidence supported a finding that an *allegation* of tip solicitation does not automatically result in termination and depending on the "circumstances" may result in lesser discipline or none at all. J.A. 817.[7]   Indeed, both Collier, and current general manager of FSS at Logan Airport, John Cardinale, testified that whether an allegation of tip solicitation resulted in termination was a matter of discretion:

---

[7]     Q: So, Mr. Cardinale, if – if I heard you correctly, if a skycap is accused of soliciting a tip at FSS, the procedure is that he would be suspended pending an investigation, correct?
A: That's correct.
Q: So, in other words, it's not an automatic termination, you stop and look at the circumstances, right?
A: Correct.
Q: And [you] apply a judgment as to whether or not solicitation actually occurred or did not occur.
A: Correct.
Q: Well, do you agree there's some element of subjectivity to making the determination then? It's not black and white, he was accused of soliciting, so he's out. You stopped and looked at it for a while and thought about it, right?
A: I would, yes.

J.A. 817:3-18.

Q: So, Ms. Collier, it's a bit of a judgment call, isn't it, whether or not FSS has found that an employee has solicited a tip, correct? You have to make a judgment?
A: I have to make a judgment based on my experience, which is vast.
Q: Okay. So, in other words it's not so black and white, if you're accused of soliciting a tip, you're fired, because you have to make a judgment about whether or not there really was tip solicitation, correct?
A: I do.

JA 908:18-909:2.

Thus, Travers presented clear evidence to the jury that whether an employee was fired for alleged tip solicitation was a matter of discretion. The jury could reasonably conclude that here, FSS used the customer's alleged complaint as a convenient excuse to terminate Travers when the true motive was actually his protected activity. Indeed, the inference of pretext is further underscored by the fact that FSS's "investigation" of tip solicitation appears to have been a sham. The evidence showed that no one from FSS talked to the customer or tried to obtain any information from her after the initial complaint. J.A. 747:1-6.  In reality, the investigation consisted of nothing more than FSS talking to Travers and obtaining reports from two other skycaps and a supervisor who worked that day, all of whom reported

that nothing unusual happened, J.A. 746:17-747:6; 742:16-743:9, and of Collier consulting with legal counsel. J.A. 901:18-902:12.[8]

FSS next argues that "Travers was directly accused by a passenger of tip solicitation" and that "Travers admits the accusation." FSS Br. at 27. This is simply not true. Indeed, Travers denied ever soliciting a tip and instead explained his interaction with the customer. J.A. 623:17-624:10; 626:7-11. Travers testified that he told the customer "tipping is optional, but greatly appreciated" – something that FSS management *agreed* was an appropriate and allowable thing to say to customers. J.A. 819:16-22. When the customer got upset in response to Travers making this FSS-approved statement, Travers testified that he attempted to explain that "The tip is optional. It's just like in a restaurant. If you'd like to tip, you can. If you don't want to tip, you don't have to. I apologize if you're upset." J.A. 624:1-4. This is consistent with what he wrote in his contemporaneous

---

[8]    It is not even clear the customer's complaint was about Travers given that Travers testified that he recalls having an interaction with a customer who looked different from the customer the JetBlue representative described. See infra, n. 3. Furthermore, that Mr. Travers had a history of being a good employee was apparently not taken into account in the investigation or decision-making process, even though Travers had been selected as "lead skycap" and given the responsibility of training his coworkers and despite six years of service without any discipline. J.A. 597:10-18, 598:17-22, 695:3-8.

report on the matter. J.A. 1193.  FSS's attempts to characterize this as

Travers "admit[ting] the accusation" amounts to a dishonest manipulation of

the facts.

Significantly, this very Court expressly disagreed with FSS's

contention that Travers admitted to tip solicitation.  This Court noted that:

> According to the statement Travers wrote on the day of the
> passenger's complaint, he told the passenger that a tip was "optional
> just like [at a] restaurant." Flight Services itself posts a sign at the
> skycap stand similarly stating, "tipping is optional but greatly
> appreciated," and Flight Services admittedly allows its skycaps to tell
> customers directly that "tips are not required but are appreciated." The
> company's policy, by comparison, does not define "tip solicitation"
> but includes only three examples, all of which are significantly more
> extreme than the conduct Travers has admitted: "advising passengers
> of the amount of the tip that they must give to the employee,"
> "refusing to provide service without first receiving a tip," and "selling
> weight." Plausibly, then, Travers's conduct, while perhaps edging
> beyond what was expressly permitted, did not indisputably cross into
> what was clearly prohibited.

Travers I, 737 F.3d at 148.

This Court correctly found that what Travers "admitted to" did not fall

within the company's undefined prohibition on "tip solicitation."[9]  This

---

[9]    FSS argues that the skycaps who testified at trial said "that if they said
what Travers said, it would be tip solicitation and they would be fired." FSS
Br. at 10.  FSS twists the testimony to serves its own ends.  For example,
taken as a whole, Paz's testimony was that "if you says what's on the sign,
you're legal, you okay." J.A. 844:14.  Travers testified that he *did* say what
was on the sign, but that when the customer asked "Are you telling me I
have to tip?" he explained to her that it was optional, like in a restaurant.
J.A. 623:19-624:4.  McLarty was asked: "you wouldn't tell a passenger that

Court further noted "it remains plausible that the pre-existing retaliatory motive tipped the scales when the company decided whether Travers had violated company policy in a way that required his termination." Id.  This is precisely what the jury found after the parties had presented all of their evidence at trial.  Thus, far from being "undisputed" as FSS contends, FSS Br. at 26, it is not at all clear that an allegation of tip solicitation would automatically result in termination or that Travers ever engaged in "tip solicitation."  Instead, the evidence shows that the company exercised discretion in deciding "whether Travers had violated company policy in a way that required his termination," 737 F.3d at 148, and that the discretion was tainted by retaliatory animus.

### 2. Other FSS skycaps accused of tips solicitation received lesser, if any, discipline.

FSS contends that it "had more evidence of tip solicitation against Travers than against other employees terminated for tip solicitation,

---

tipping is like in a restaurant, right?" and he answered "I've never encountered that, no."  J.A. 727:18-20.  When pressed by defense counsel he simply stated "No, that's not my vocabulary."  J.A. 727:21-22.  In other words, McLarty testified that he does not typically use such an analogy but he did *not* testify that doing so was a sure way to get fired, as FSS suggests. Furthermore, several witnesses like Wei and Faiz were still employed by FSS as skycaps and the jury could infer that they felt reluctant to testify that they would engage in the same behavior for which Travers was ultimately fired.

demonstrating no differential treatment in Travers' termination." FSS Br. at 29. This statement is completely contradicted by the evidence presented at trial, and once again is an attempt to have this Court second-guess the jury's factual conclusions. At trial, Plaintiff presented abundant evidence that other employees accused of tip solicitation received lesser (if any) discipline. Perhaps most notably, Travers presented evidence that skycap Jing Wei was accused of tip solicitation within a few weeks of Travers, and under very similar circumstances, but that Wei was not terminated as a result.[10] In an attempt to explain away this clearly differential treatment, FSS tries to draw a distinction between Travers and Wei, arguing that (1) the complaint against Travers was "direct" while the complaint against Wei was from the family member of a passenger, and (2) that Wei denied the incident. FSS Br. at 31-33. This effort fails, as the jury was free to disbelieve that these manufactured distinctions were the real reason for their disparate treatment.

First, FSS failed to provide compelling evidence at trial that convinced the jury that there is any actual rule that a "direct" complaint of tip solicitation is more likely to result in termination than a complaint from a family member (with the exception of self-serving assertions by Collier, see

---

[10]    Although Wei was also in the underlying lawsuit, he was not seen as a leader like Travers. See infra, n. 13.

J.A. 913:25-915:16).  However, Travers presented evidence that no such rule

existed.  Former FSS supervisor Agba testified that he unaware of any FSS

policy that would distinguish a complaint that comes from a passenger

directly, as opposed to a passenger's family member. J.A. 1011:20-1012:4.

Moreover in reversing summary judgment in this case, this Court

specifically found with regard to Wei that "a rational jury could also

conclude on this record that the first-hand/second-hand distinction served

merely as a post-hoc justification for disparate treatment," because FSS

"produced no compelling evidence that it recognized such a distinction

before tendering it as an explanation in this lawsuit." Travers I, 737 F.3d at

149.  This was equally true at trial where FSS offered no evidence of such a

distinction save for Collier's bald assertions. J.A. 911:1 -915:12.[11]  Second,

as already explained, supra, p. 23-24, Travers did not admit to soliciting a tip

and therefore the jury could have concluded that the distinction FSS

attempted to draw between Wei and Travers (that Wei denied the incident

---

[11]     Indeed, Collier admitted that the complaint against Wei may well
have been a firsthand customer complaint because she did not know
"whether the person who wrote that complaint was traveling with her
mother" at the time.  J.A. 913:21-24.

while Travers admitted to it) was not the real reason for their disparate treatment.[12]

Moreover, Travers presented evidence of numerous other skycaps, besides Wei, who were not terminated despite allegations of tip solicitation. FSS attempted to distinguish these incidents at trial, but the jury was free to not credit these distinctions:

- **Larry McLarty:** McLarty testified that he was accused of tip solicitation and being "rude and unprofessional" but was merely written up rather than suspended or fired. J.A. 721:6-723:6. He further testified that he was "surprised" when he learned Travers had been terminated because "[t]here was never an issue where a skycap was terminated for soliciting, or alleged soliciting, at least as long as I've been a skycap," which was 29 years. J.A. 703:15-17; 720:25-721:8. FSS dismisses this example because no written complaint by a customer was made against him or documented. FSS Br. at 37-38. However, the evidence shows that no written complaint would have been made against Travers either, had the customer service representative not expressly requested that the customer put something in writing. J.A. 910:16-19.

- **Rachid Faiz**: McLarty testified that skycap Faiz was accused of tip solicitation but was not terminated. J.A. 723:7-724:4. FSS points out that Faiz denied that he had ever been accused of tip solicitation, but it was up to the jury to determine his credibility, particularly given that he was still a skycap working for FSS at the time of trial. J.A. 1062:12-15.

---

[12]    The jury could have concluded that the incident with Wei was even more serious considering that the complainant in his case took the time to write an email about the incident days later, (showing she was still very upset about it) whereas in Travers' case the complainant only made a written complaint on the spot because she was specifically prompted to do so by a JetBlue representative. J.A. 1089:20-23.

- **Gerry Quaranto:** Former FSS supervisor Nabil Agba testified that
  skycap Quaranto was not initially terminated when he was accused of tip
  solicitation. J.A. 1008:11-1009:18. Notably, Quaranto was accused of far
  more egregious conduct than Travers. J.A. 1221. Specifically, Quaranto
  was accused of asking for a tip in return for waiving an oversized bag fee
  and of soliciting a $20 tip. J.A. 930:9-931:5.  Quaranto was merely
  suspended but when FSS manager Lisa Varotsis learned that he had been
  allowed to return to work (indeed while Travers' case was still pending),
  she reversed that decision and had him fired. J.A. 1008:11-1009:18.
  Quaranto was fired *after* Mr. Travers and by the same decision-makers,
  creating the inference that FSS might have been creating a comparator
  after the fact. J.A. 927:17-930:11.  Thus, the jury could reasonably find
  that Quaranto was not a valid comparator and that FSS fired him to
  bolster their position. Lane v. McKeithen, 423 F. App'x 903, 906 (11th
  Cir. 2011) (where individual was not "a similarly situated comparator,
  [the] proffered evidence concerning his hiring was irrelevant"); Bryant v.
  Aiken Reg'l Med. Centers Inc., 333 F.3d 536, 546 (4th Cir. 2003)
  (rejecting comparator because "[the applicant] was not hired until several
  months after [the plaintiff] filed charges").

- **Polikron Adhami**: The evidence presented at trial supported the finding
  that Adhami was accused of tip solicitation but was suspended for ten
  days rather than fired, and then ultimately resigned. J.A. 1286.  FSS
  asserts that "no reasonable jury could conclude that this evidence
  demonstrated FSS failing to apply its policy consistently, as Collier
  testified without rebuttal that Adhami would have been fired had he not
  resigned." FSS Br. at 14.  However, the jury could have determined that
  Collier's testimony was not credible given that the contemporaneous
  disciplinary report clearly reflects a 10-day suspension and there is no
  evidence besides Collier's bald assertion that Adhami "would have been
  fired." J.A. 921:20.

- **Tony:** Travers presented evidence that a skycap named Tony was not
  fired although he was accused of tip solicitation, and in fact that FSS was
  going to move him to a different curb in another part of the company.
  Travers' manager, Rob Nichols, told Travers that Tony was only fired
  after FSS learned that his wife obtained the customer's phone number
  and called the customer at home in an attempt to make sure her husband
  was not fired. J.A. 649:1-9; 698:15-699:24.

- **Qok:** Agba testified that another skycap named Qok was accused of tip solicitation but was not fired. J.A. 1007:9-24. FSS attempts to dismiss this evidence and the evidence regarding Tony as "vague and unsubstantiated," FSS Br. at 39. It was for the jury to weigh the credibility of the evidence.

- **Andrew Stone:** Travers presented evidence at trial from a former FSS supervisor that skycap Andrew Stone was accused of tip solicitation but was not fired. J.A. 1008:3-10. The evidence showed that Stone was the roommate of FSS manager John Cardinale and was disciplined many times for various other infractions, but never fired, despite the allegation of tip solicitation. J.A. 821:22-24; 827:7-14. This is further evidence from which the jury could conclude that FSS managers utilized their discretion to single out and terminate Travers.

Moreover, as this Court noted, "[a]lthough [FSS] disputes [evidence that other employees accused of tip solicitation were not terminated], if believed by a jury it would point in the direction of a finding that Travers might well have been spared had he done only what he admitted doing, but for a desire to get rid of him." Travers, 737 F.3d at 148. The jury was free to find the evidence described above persuasive, and there is simply no basis for reversing that reasonable conclusion.

### 3. The comparators offered by FSS who were terminated for tip solicitation had engaged in conduct far more egregious than Travers.

Likewise, the jury could easily have found that the remaining comparators offered by FSS for the proposition that all skycaps who receive a first-hand complaint of solicitation are fired, were not similar to Travers. Indeed, these comparators engaged in offensive and sometimes abusive (or

even criminal) behavior toward passengers.  In all cases, the conduct went far beyond mere tip solicitation and certainly was far beyond the allegation against Travers.  Even if the jury were to credit the customer's version of events rather than Travers', the difference between the alleged incident and these comparators is like night and day.  Although tip solicitation was an element of each incident described below, the jury could reasonably conclude that the proffered comparators were not terminated for mere tip solicitation but for the egregious misconduct that accompanied their tip solicitation:

- **Sami Gjinishi** was terminated following an incident in which he attempted to forcefully take money from a wheelchair-bound passenger. After transporting the passenger to the pick-up curb, Gjinishi repeatedly asked the customer "you got money?" When the passenger responded that she only had a $20 bill, Gjinishi attempted to reach into her purse to take her money but was prevented by a "belt-clasp" located on the bottom of the purse. After unsuccessfully attempting to take money forcefully from the passenger's purse, Gjinishi stood with his hand out asking for money. The passenger eventually gave Gjinishi her $20 bill, which he put in his pocket without offering any change. Only after the customer asked for change did Gjinishi reluctantly give her $5 back. The passenger described the skycap as "a threat" to elderly passengers, that the experience was "horrific," and specifically requested that he be terminated.  J.A. 925:24-927:9.

- **Kwado Acheampong** was terminated for threatening to abandon an elderly wheelchair bound passenger alone in the terminal if he did not receive a tip. After Acheampong arrived with a wheelchair to collect an elderly passenger in the check-in area, he discovered she would be travelling alone. He allegedly asked the passenger's family "Who is going to tip me?" and then stated "Do you want me to take her to the plane or leave her at the gate?" The passenger's family construed this as

threat.  J.A. 922:6 -923:7; J.A. 1209.  Notably, this complaint was made by a third-party family member of the passenger – a distinction Collier indicated was supposedly critical in explaining why Wei was not fired but Travers was.  J.A. 1209.  Likewise, Acheampong denied the allegation; another supposed distinction between Wei and Travers that FSS proffered. J.A. 1210.

- **Lumuri Noti** was terminated after she pushed a wheelchair bound passenger to an ATM and indicated that her shift had ended and she needed to be reimbursed for staying longer. After demanding (and receiving) a tip, Noti then dropped the passenger's personal belongs, including a laptop and a camera and pushed the passenger into a cart, bruising the toes of the passenger's foot which was already in a cast. J.A. 927:15-928:9.

- **Emanual Adom** was terminated at Reagan Airport rather than Logan Airport, J.A. 1213, and was accused of telling a customer "Be nice to me and give me more than what I got from the last passenger, which was $20." J.A. 923:8-23.

These examples show that the jury had ample evidence from which to conclude that the comparators offered up by FSS were not similarly situated to Travers and that their conduct was far more outrageous than what Travers was accused of, including three incidents involving harassment of particularly vulnerable passengers.  FSS failed to produce even one appropriate comparator who was terminated merely for receiving a "first-hand complaint" of tip solicitation from a passenger.  Accordingly, the jury could reasonably conclude that FSS's proffered explanation for Travers' termination was pretext.  Indeed, this Court already found that the proffered comparators "engaged in conduct going well beyond what Travers admitted

to" and concluded that "the fact that [FSS] fired these employees for such conduct does not mean that it would have fired Travers for materially less egregious conduct." Travers, 737 F.3d at 149.

FSS asserts that the "documentary evidence produced relating to [Acheampong, Adom, Gjinishi, Quaranto, Noti, and Wei] was identical at summary judgment and trial" and therefore insufficient to prove retaliation as a matter of law. FSS Br. at 31. This argument ignores the fact that the jury had the benefit of live testimony and was able to weigh credibility in a way this Court could not in Travers I. See Jennings, 587 F.3d at 437 ("Circuit judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial"). More importantly, the evidence that these so-called comparators engaged in much more egregious conduct than Travers was just *one piece* of the evidence from which the jury could infer retaliation.

Ultimately, Travers presented evidence that whether an employee was fired for alleged tip solicitation was a matter of discretion, that numerous other employees were not fired for tip solicitation, and that those who were fired engaged in much more egregious conduct. The jury could reasonably conclude that FSS used the customer's alleged complaint of tip solicitation as a convenient excuse to terminate Travers when the true motive for his

33

termination was his protected conduct.  As Justice Ginsburg noted in her

Reeves concurrence, "the ultimate question of liability ordinarily should not

be taken from the jury once the plaintiff has introduced . . . [first] evidence

establishing a 'prima facie case,' . . . and second, evidence from which a

rational factfinder could conclude that the employer's proffered explanation

for its actions was false." Reeves, 530 U.S. 154.  Here, Travers has clearly

made out a prima facie case of retaliation, and has presented evidence from

which a jury "could conclude that [FSS's] proffered explanation for its

actions was false" Id.   Thus, the jury's verdict should not be disturbed.

### 4. The jury could have concluded that Sarah Collier had her own retaliatory animus against Travers.

As this Court has already held, the jury could have inferred that the

CEO's strongly held retaliatory sentiments were known by others like

Varotsis and Collier. Travers I, 737 F.3d at 147 ("if Weitzel would

unabashedly and repeatedly voice such sentiments to Nichols, then why not

to Nichols's replacement, Varotsis, or to the director of human resources

[Collier], who approved the firing?").  This theory was substantiated at trial,

where Collier testified that she was the company representative responsible

for defending against the underlying lawsuit and for saving the company

money.  J.A. 867:11-15, 889:12-894:25.  She also testified that she spoke

with Bobby Weitzel frequently as part of her job, including discussing the

case and legal fees. J.A. 867:7-15.  She testified that she was the one who made the decision to fire Travers, that she consulted legal counsel regarding the issue, and that she took three weeks to make the decision.  J.A. 901:18-902:12. 1.  However, she insisted improbably that she never discussed Travers' termination with Weitzel, who she spoke to regularly as part of her duties. J.A. 902:10-903:10; 933:7-24.  Thus, the jury easily could have disbelieved Collier and concluded that she was aware of the retaliatory animus of the Weitzels or that Weitzel really was involved in some way in the decision.

Indeed, the First Circuit's previous decision noted that "[a] rational juror could conclude that such strongly held and repeatedly voiced wishes of the king, so to speak, likely became well known to those courtiers who might rid him of a bothersome underling." Travers I, 737 F.3d at 147.  The jury could have inferred (1) that Collier knew of Weitzels' animus (which can be inferred with or without direct evidence of his comments), or (2) that Collier harbored her own retaliatory animus against Travers.

Indeed, the jury could just as easily have found that Collier herself, who claims to have made the decision to terminate Travers, harbored her own retaliatory animus.  Even without any of the testimony regarding

Weitzel's comments urging Nichols to "get rid of Travers," there was still ample evidence to support a finding that Collier harbored her own animus. Collier testified that she was the FSS representative in charge of coordinating the defense against the costly underlying lawsuit, was responsible for minimizing litigation expenses, and knew that Travers was the lead plaintiff and organizer of other skycaps in the lawsuit. JA 887:10-893:11.[13]  Former FSS supervisor Agba testified that managers frequently discussed the lawsuit, J.A. 988:4-9, which was "more important than other cases," and that he was told that FSS could not "afford to lose cases because [Weitzel] doesn't like it." J.A.1004:1-1006:17.  Agba further noted that he "always heard th[at] corporate is not happy about [the lawsuit]," J.A.1006:15-17, and Collier herself admitted that she frequently discussed the high cost of litigating the case with Bobby Weitzel. J.A. 889:11-893:11

---

[13]     Testimony at trial consistently demonstrated Travers' role as a leader of the underlying lawsuit. Agba agreed that "it was clear that [Travers] was the leader" of the case.  (J.A. 991:1-4).  Wei noted that Travers "would do all the talking between the lawyer/skycap" and that Travers "would encourage me to stay [in the case]." (J.A. 573:1-7, 574:8-11).  McLarty testified that "[Travers] passed along information to the other skycaps and asked if they would be interested" and that "Joe was more involved than I was.") (J.A. 712:15-17, 713:10).  Paz testified that Travers "was the middleman between the lawyers and us.  He was recruiting, talking to – to join the lawsuit."( J.A. 836:6-13).

(admitting that "the money expenditure was never good" and that Weitzel questioned her about high legal fees).

Collier later testified at trial that whether an allegation of tip solicitation resulted in termination was a matter of discretion. See supra, p. 21-22.  Here, she exercised that discretion to fire Travers, where other skycaps were not fired for similar conduct. "[E]vidence suggesting that a defendant [employer] … has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant [employer] could be masking its actual, illegal motivation." Reeves, 530 U.S. at 154.

Moreover, Agba testified that once Travers was terminated, FSS managers discussed a plan to win the lawsuit by talking to each skycap individually and convincing them to drop out.  J.A. 995:4-996:22.  Indeed, within the next several months of Travers' termination, plaintiffs started dropping out of the case.  Id.  A reasonable jury could conclude that firing Travers, the leader of the skycaps and lead plaintiff in the case, was just one step in a concerted effort take the wind out of the sails of the lawsuit.  Taken together this clearly amounts to sufficient evidence from which a jury could

infer a retaliatory motive.[14]  Indeed, it was part of Collier's job description to

neutralize lawsuits like the one that Travers was working tirelessly to keep

---

[14]     FSS counters that Collier's "business judgment to terminate Travers should not be second guessed." FSS Br. at 35.  However, the cases FSS cites are wholly inapposite. For example, in Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991), the Court noted a "lack of temporal coincidence", and found the record "more consistent with an employer's longstanding desire to improve an employee's behavior than with some sort of vengeful preoccupation."  By contrast, here, Travers presented evidence of (1) "differential treatment in the workplace," (2) "temporal proximity" between his deposition and intensification of the underlying lawsuit and his termination, and (3) "comments by the employer which intimate a retaliatory mindset." Id.  Moreover, Travers was "lead skycap."  Similarly in Anderson v. Home Depot U.S.A., Inc., 2004 WL 42569 (D. Mass. Jan. 8, 2004), the Court found Plaintiff "ha[d] not produced any evidence that th[e] [employer's stated] reason was pretextual and that the real basis for his termination was . . . animus," whereas here, Travers has produced ample evidence of disparate treatment of comparators, the timing of the termination just as the lawsuit was intensifying, comments made by the Weitzels, and testimony from Collier about the cost of the lawsuit and her motivation to neutralize it.  Likewise in Ramirez-De-Arellano v. Am. Airlines, Inc., 133 F.3d 89, 90 (1st Cir. 1997), the record was "replete with documented illustrations of Ramirez's performance problems and repeated failure to follow American's policies and procedures" whereas here, Travers was a model employee.  FSS will likely argue that Travers was fired long after the lawsuit was filed, undercutting any claim of temporal proximity, however, courts have recognized "that separate protected activity c[an] occur in a lawsuit or charge [such as]…giv[ing] a deposition that angers a defendant," Gray v. City of Montgomery, 756 F. Supp. 2d 1339, 1351 (M.D. Ala. 2010), and that was clearly the case here, where the lawsuit was becoming increasingly contentious, Travers had recently had his deposition taken, and management was apparently trying to get plaintiffs to drop out of the case. J.A. 995:4-996:22.

afloat, and the jury could find she exercised her broad discretion to do just that.

### C. Travers' Testimony about Weitzel's Statements was Properly Admitted and the District Judge's Subsequent Ruling that the Testimony was Inadmissible Hearsay was Error.

FSS argued below, and the District Court agreed, that Travers' statements about what Nichols told him regarding CEO Weitzel's animus-filled comments, constitute inadmissible hearsay. Although Travers' testimony relaying what Nichols told him was not necessary to the jury's verdict (for the reasons explained <u>supra</u>, Part IIA & B), this decision, after the fact, that his testimony should not have been admitted, was erroneous. <u>Poulis-Minott</u>, 388 F.3d at 357 (court reviews District Court's evidentiary rulings for abuse of discretion).

First, FSS erroneously argued that Nichols was no longer working at FSS at the time he made the statements, and that they therefore did not constitute statements of a party opponent. J.A. 1323-24, FSS Add. at 16. Specifically, Travers testified at one point that Nichols made his comments in the early summer of 2010 although evidence later showed that Nichols had been terminated in the spring of 2010. However, Travers also testified that Nichols made the comments at work, on the "curb." J.A. 617:4-620:2.

There is no reason why Nichols would be speaking to Travers at work, on the "curb" at Logan after he no longer worked there.  Rather, in 2014, some four years later, the jury could easily have understood that Travers simply did not remember the exact date of his conversation with Nichols about Weitzel's animus-filled comments (i.e. spring vs. summer).  Indeed, Travers later clarified that he may have earlier misstated the time of his conversation with Nichols and that it did take place while Nichols was still working for FSS. See supra, n. 2; J.A. 640:7-14.

Thus, it was error for the District Court to conclude that these comments were hearsay simply because at one point in his testimony Travers misspoke and said the comments were made in the summer of 2010 instead of the spring, when all the other evidence indicated that they were made while Nichols still worked for FSS.[15]

Given that as jury could reasonably find that Nichols was still employed by FSS at the time he made these statements to Travers "at work" and on the "curb," the statements are admissible, as they clearly "*concern matters within the scope of [Nichols'] agency or employment*" as a manager

---

[15]    This evidence also undercuts FSS's flagrantly untrue argument that Plaintiff's counsel knowingly presented testimony she knew was not admissible.  See infra, Part V, pp. 54-55.

at FSS. <u>Woodman v. Haemonetics Corp.</u>, 51 F.3d 1087, 1094 (1st Cir. 1995).  Moreover, the comments are admissible in any case because they were not "offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), but rather to show FSS's retaliatory intent.  Since the statements are not hearsay under the Rule's definition, it does not matter whether Nichols was a party opponent.  Because these statements were properly admitted in the first place, the District Court's later decision, concluding that the statements were inadmissible, was in error.  The evidence was properly before the jury.

## III.    The District Court Properly Upheld the Jury's Award of Back Pay Damages.

The jury's award of $90,000 in back-pay damages was well supported by the record and FSS's arguments to the contrary are unavailing.  First, FSS's argument that Travers' back pay award should be reduced or eliminated due to "unclean hands" and "after-acquired evidence" that would have justified his termination because of under-reporting of tips, is incorrect.  FSS Br. at 41-42.  First, "unclean hands" is an equitable doctrine that does not apply to a claim at law for damages.  <u>See</u> <u>Howe v. Fiduciary Trust Co.</u>, 13 Mass. L. Rep. 125 (Mass. Super. Ct. 2001) (rejecting uncleans hands defense because "equitable defenses cannot prevail against a claim at law"); <u>Srebnick v. Lo-Law Transit Mgmt., Inc.</u>, 29 Mass. App. Ct. 45, 49 (1990)

(an equitable defense is "not generally available as a defense to a legal

claim").  Here, Travers made no claims sounding in equity.

Moreover, courts considering the question of whether underreporting

tips should affect a back-pay award have found that un-reported tips could

still be considered in calculating a back-pay award. Atl. Limousine, Inc. v.

N.L.R.B., 243 F.3d 711, 716 (3d Cir. 2001).  In Atl. Limousine, the Court

recognized that "federal tax policy would appear to have no interest in

limiting a backpay award [and] [i]n fact, it could be said that it has the

opposite interest because once [plaintiffs] receive an award (that is not

limited by reference to reported income), they will have to pay tax on what

they receive, paying the federal government more than if the award had been

limited to their reported income."  The Court further noted that "no federal

policy is relegated to a lesser status" and that assuring an employer "will

have to 'make whole' [] employees against whom it wrongly discriminated"

was just as important as federal tax policy. Id. at 717; see also Mori-Noriega

v. Antonio's Rest., Inc., 923 F.2d 839 (Table) (1st Cir. 1990) (unpublished)

(district court properly relied on plaintiff's testimony about his tip income,

instead of his tax returns, in calculating lost wages because "[w]hile it is

obviously wrong not to report tips as income, this is not an income tax case.

And, we are aware of no rule of law that prevents a judge from accepting the

plaintiff's account of his actual, higher earnings, as true."); <u>Am. Legion Post</u>

<u>12 v. Susa</u>, 2005 WL 3276210 (R.I. Super. Ct. Nov. 30, 2005) .  The District

Court correctly adopted the reasoning of these courts, noting:

> [T]his was not a tax case and it is not my job to prosecute people for
> potential tax violations.  The issue, rather, was simply one of whether
> if the jury did find that he had been dismissed or terminated for
> retaliation, he had lost income [a]nd I think there was supportable
> evidence in the record to allow the jury to come to the figure they did.

J.A. 1450.  Thus, the District Court's ruling was proper and should be

upheld.

Likewise, FSS's argument that so-called "after-acquired evidence" of

underreporting of tips would have justified Travers' termination in any case

is completely unavailing.  No evidence in the trial record supported the

notion that underreporting of tips always results in termination or that FSS

would have terminated Travers for underreporting. Indeed, FSS's policy

says something different: "If you work in a tipped position and fail to

complete a tip report each pay period disciplinary action ***up to*** and including

termination ***may*** be issued." J.A. 1268 (emphasis added). Thus, under FSS's

policy, termination could result but not necessarily. Moreover, this policy

only threatens discipline if the employee "fails[s] to complete a tip report

each pay period."  Since there is no evidence that Travers failed to complete

a tip report each pay period (as contrasted with submitting an accurate

43

report), it is difficult to see how this policy would even apply. The same is true of FSS's policy regarding falsification of records[16] – no evidence in the trial record showed that filling out an inaccurate tip report always results in termination or that FSS would have terminated Travers. Likewise, evidence in the record consistently demonstrated that all of the skycaps regularly made more than $40 in tips during a shift,[17] suggesting that to the extent Mr. Travers was underreporting his tips, the same was true of all the other skycaps.[18] There was no evidence in the record of any skycaps being terminated for underreporting their tips.

Second, FSS's argument that Travers' back pay award should be eliminated because he fully mitigated his damages fails because a reasonable jury could easily conclude from the evidence that he was not able to fully mitigate his damages. "Converting legal damages into a monetary award is

---

[16]    "Dishonesty, misrepresentation of facts, or falsification of records (including employment application) is prohibited and **_may_** result in disciplinary action **_up to_** and including termination." J.A. 1278.

[17]    See J.A. 830:3-14 (Paz testified skycaps made $150 to $200 in tips per shift); J.A. 565:6-18 (Wei testified he regularly made $200 per shift in tips); J.A. 984:12-18 (Agba testified skycaps regularly made between $200 and $300 in tips per shift and sometimes as much as $600).

[18]    Indeed, fellow skycap Paz agreed that skycaps are "sometimes a little bit nervous talking about how much they make in tips" and "get a little uncomfortable sometimes when people ask them" about tips. J.A. 830:22-831:5.

the jury's job -- consequently, only rarely and in extraordinary circumstances will [a court] veto the jury's decision." Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 80 (1st Cir. 2010); see also Tevelson v. Life & Health Ins. Co. of Am., 643 F. Supp. 779, 784 (E.D. Pa. 1986), aff'd, 817 F.2d 753 (3d Cir. 1987). "Defendants bear the burden of proof on the issue of mitigation of damages." Powell v. City of Pittsfield, 221 F. Supp. 2d 119, 151 (D. Mass. 2002), aff'd and remanded sub nom. Powell v. Alexander, 391 F.3d 1 (1st Cir. 2004); U.S. v. N.J., 530 F. Supp. 328, 336 (D.N.J. 1981) (noting that "[i]t is the employer's burden to establish the existence of … limitation[s] on full back pay for a victim of discrimination" and "[u]ncertainties in the calculation of relief are to be resolved against the employer, not the innocent victim of his act"). Here, FSS has failed to meet its burden on the question of mitigation and indeed, there was ample evidence at trial from which the jury reasonably concluded otherwise.

The evidence presented showed that Travers made more as an FSS skycap working at the curb at JetBlue than he later did as a G2 skycap working at the Southwest Airlines curb. First, Travers testified that he typically made $200-$250 in tips per shift while working for FSS, yet only approximately $100 per shift at G2 (as a Southwest skycap), and he only worked three shifts per week at Southwest as compared with five shifts a

45

week for FSS. JA 632:14-636:24. Other skycaps' testimony was consistent
with this fact: Wei testified that skycaps received about $200 per shift at
FSS, J.A. 565:16-18, and Agba testified that skycaps received around $300
each day in tips and sometimes even $600. J.A. 984:12-18.

Thus, at the low end of the spectrum, Travers was making $100 less
per shift as a Southwest skycap than he made while working at FSS such
that if he worked fifty weeks a year, he lost approximately $25,000 per year
because of his discharge. This estimate (based on $100 less per shift x 5
days per week x 50 weeks per year) is conservative because Travers also
worked fewer shifts at Southwest than he had at FSS prior to his termination
and it assumes only a minimal $100 difference. Since FSS discharged
Travers on September 27, 2010, or approximately three years and five
months before the jury reached its verdict, the jury could have reasonably
found that he was due *at a minimum* $85,000 in back pay.[19] Thus, the jury's

---

[19] Moreover, income Travers earned working for JetBlue does not count
as mitigation from his damages because it is undisputed Travers was *already
working* for JetBlue part-time prior to his termination. The jury was properly
instructed on mitigation and the moonlighting doctrine. J.A. 1153, See
Leidel v. Ameripride Servs., Inc., 276 F. Supp. 2d 1138, 1144 (D. Kan.
2003) ("[i]nterim earnings from second or 'moonlighting' jobs are also
generally not deducted from a back pay award because an employee could
have held such a job and retained those earnings even if [he had not been
fired]").

$90,000 back pay award was towards the low end of the range of

permissible damages and should not be eliminated.

### IV. The District Court's Remitted Award of Emotional Distress Damages of $50,000 Was Proper.

Defendant's claim that the District Court's reduced emotional distress

damages award of $50,000 is excessive is belied by the record and by

numerous other cases awarding similar sums in analogous situations.  Where

a district court has entered a remittitur this Court's review is for abuse of

discretion, viewing "the evidence in the light most favorable to the jury's

award." Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas

Municipio, 754 F.3d 17, 21 (1st Cir. 2014). "[J]udicial review of [emotional

distress damage] awards is . . . even more constrained where, as here, the

trial court has already pared the original jury award." Trainor v. HEI

Hospitality, LLC, 699 F.3d 19, 32 (1st Cir. 2012).

Moreover, the "disinclination to second-guess a jury's evaluation of

the proper amount of damages is magnified where, as here, the damages

entail a monetary valuation of intangible losses." Fryer v. A.S.A.P. Fire &

Safety Corp., 2010 WL 3191785, *9 (D. Mass. Aug. 12, 2010) (internal

quotation omitted).  Thus, "[f]urther relief is not warranted unless the award,

as remitted, remains so extravagant as to shock the appellate conscience."

Trainor, 699 F.3d at 32.  Here, the Court already drastically reduced the

emotional distress award – from $400,000 to $50,000 – and rather than

challenge it, Travers accepted remittitur.  J.A. 1420, 1422.

In remitting the award, the District Court carefully considered the

evidence presented, J.A. 1449, and settled on a damages figure of $50,000.

Any suggestion that this sum is "so extravagant as to shock the []

conscience" is simply inaccurate, where ample evidence at trial

demonstrated the severity of Travers' emotional distress.  Indeed, Travers

testified to how much he loved his job, and to the embarrassment of having

to tell his girlfriend, his mother, and his coworkers at JetBlue that he had

been fired.  See J.A. 629:5-631:19.  Testimony at trial included that it was

difficult for him to get out of bed in the morning, leaving him with no

energy to play with his young son or do any of the other activities he used to

enjoy and that his termination caused friction with his partner of 14 years

with whom he resides and has a child. See J.A. 629:5-631:19; 1028-1031.

See Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 64 (1st

Cir. 2005) (upholding $250,000 emotional distress damages award where

plaintiff "experienced financial difficulties, [and] her marriage suffered" but

no evidence of medical treatment was presented); Koster v. Trans World

Airlines, Inc., 181 F.3d 24, 35-36 (1st Cir. 1999) (upholding $250,000

emotional distress damages award based in part on testimony regarding

damaged family life despite there being no evidence of medical treatment);

McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006) (upholding

award of $300,000 in emotional distress damages where Plaintiff did not

seek medical treatment or have long-term effects, but nonetheless suffered

"substantial humiliation and damage to his reputation" and problems with

family relationships).[20]  Travers' partner of 14 years, Belkys Angeles,

testified that the termination "impact[ed] him very dramatically," including

his relationships with her and his children, and that she was "desperate"

because "the situation was so bad." J.A. 1028:19-1031:4.

---

[20]     FSS attempts to manufacture an alternative source for Travers'
depression, citing his mother's ailment. FSS Br. at 45.  Travers mentioned in
passing that his mother was suffering from Alzheimer's disease and it seems
clear that this testimony related to the fact that Travers was under added
pressure and emotional strain because he was responsible for her care at the
time of his retaliatory discharge.  J.A. 630:14-18.  This question is for a jury
to decide.  Nothing in his testimony suggests that his mother's illness was an
independent cause of his emotional distress.  Likewise, FSS's suggestion
that the emotional distress award is overblown because no medical records
or expert testimony was introduced is inapposite.  Courts have consistently
held that while "evidence of a physical manifestation of the emotional
distress or expert testimony is useful [it is] not essential to support an award
of emotional distress damages." Boston Pub. Health Comm'n v.
Massachusetts Comm'n Against Discrimination, 67 Mass. App. Ct. 404, 411
(2006).  Here, the District Court, which had the benefit of seeing live
testimony and weighing witness credibility, found that $50,000 was a fair
sum, and its ruling should not be disturbed.

Based on this testimony there can be no doubt that Plaintiff suffered emotional distress. "[T]he First Circuit follow[s] the 'maximum recovery rule' which holds that any remittitur must represent the 'highest reasonable total of damages for which there is adequate evidentiary support.'" <u>WBIP, LLC v. Kohler Co.</u>, 2014 WL 585854, at *2 (D. Mass. Feb. 12, 2014) (quoting <u>Marchant v. Dayton Tire & Rubber Co.</u>, 836 F.2d 695, 704 (1st Cir.1988)). Here, if anything, the District Court's determination of Plaintiff's maximum recovery was low. Indeed, the District Court has already remitted an original jury award of $400,000 to an eighth of its original size. Under these circumstances there is simply no basis for finding the $50,000 award "extravagant" or "shock[ing]." <u>Trainor</u>, 699 F.3d at 32. Defendant's request for further remittitur or setting aside of the emotional distress damages should be rejected.

## V.    The District Court's Award of Attorneys' Fees & Costs Was Proper.

Under Massachusetts law, an employee who proves that an employer violated the wage laws "shall" be entitled to award of "the costs of litigation and reasonable attorney's fees." M.G.L. c. 149 § 150. This language mandates an award of fees to Plaintiff, because he prevailed in his claim that FSS violated the anti-retaliation provision of Massachusetts' wage laws. In its brief, FSS does not even challenge the hours, rate, or amount of the fee.

Instead, to avoid the mandatory award, FSS attempts to smear both Plaintiff and Plaintiff's counsel and suggests that they should not have been awarded fees due to misconduct. This argument was rejected by the District Court and should be rejected by this Court as well.

"This court reviews an award of attorneys' fees for abuse of discretion." Connolly, 201 F.3d 426. Here, the District Court properly considered the factors set forth in Linthicum v. Archambault, 379 Mass. 381, 388-389 (1979), and determined "the number of hours expended and the tasks indicated to be very reasonable given a heavily litigated case that involved an appeal and culminated in a five-day jury trial." FSS Add. at 24. Because "a reviewing court customarily defers to the trial judge, whose intimate knowledge of the nuances of the underlying case uniquely positions him to construct a condign award," Rossello-Gonzalez v. Acevedo-Vila, 483 F.3d 1, 5 (1st Cir. 2007), this Court should uphold the award of fees and costs. FSS's arguments to the contrary must fail.

First, FSS argues that Plaintiff's lead counsel violated the Rules of Professional Conduct, such that she should be denied attorney's fees as a sanction. FSS Br. at 46-55. FSS focuses on comments made by Plaintiff's counsel during closing statements in noting that Ms. Saulnier, the allegedly aggrieved customer, did not testify. FSS Br. at 48. Courts have found that

51

"it is not improper for counsel to compare and contrast testimony presented

and to draw reasonable inferences and conclusions from the evidence and

disparities which may be found therein." <u>Gilman v. Kessler</u>, 192 Ill.App.3d

630, 668 (1989). Thus, where counsel commented in closing statements

about a witness who did not testify, the court found that the attorney "was

not commenting upon plaintiff's failure to call a witness. Rather, the

comment was directed toward the disparities and gaps in the testimony

presented." <u>Id.</u>  The same is true here.

Moreover, Plaintiff's counsel did not "ignore two of th[e] Court's

admonishments," as FSS suggests.  In fact, the Court initially did not sustain

opposing counsel's objection and therefore, Plaintiff's counsel continued her

argument. J.A. 1128:20-1129:17.  Plaintiff's counsel began making an

argument about FSS's failure to call the passenger as a witness (not realizing

there was any prohibition against her doing so).  FSS's counsel objected, and

the Court stated to the jury the reason for the objection, but without

sustaining it.  When Plaintiff's counsel continued, the Court then instructed

Plaintiff's counsel not to make this argument, and she immediately ceased

and moved on.  Her only reference to the passenger, Ms. Saulnier, after the

Court sustained the objection, was pointing out to the jury that there might

have been a mix-up regarding which skycap Saulnier had complained about.

J.A. 1468-69.  FSS unfairly paints a picture of Plaintiff's counsel engaging

in intentional misconduct, when in fact, Plaintiff's counsel stopped once it

was clear the objection had been sustained.  Furthermore, the District Court

considered and rejected the notion that Plaintiff's attorneys fees should be

reduced, noting that "none of these alleged transgressions, . . . rose to the

level of a sanctionable breach of professional ethics." FSS Add. at 22.

Indeed, the Court found that "any ultimate risk of prejudice was allayed by

the court's explanation (twice) to the jury that witnesses are equally

available to both sides in a civil case" and by the court's "rebuk[ing]"

counsel in front of the jury.  Id. The District Court's decision not to sanction

plaintiff's counsel is entitled to deference. "So long as a district court's

reason for denying . . . monetary sanctions is (1) well founded, (2) sufficient

to the stated end, and (3) apparent on the face of the record, a reviewing

tribunal will not insist on unnecessary punctilio." Witty v. Dukakis, 3 F.3d

517, 521 (1st Cir. 1993); Krewson v. City of Quincy, 74 F.3d 15, 16-17 (1st

Cir. 1996) ("When, in determining a fee award, a district court carefully

weighs the factors to be considered and arrives at an award within a

supportable range, the appellate court will not interfere").

Next, FSS alleges that Plaintiff improperly "elicit[ed] settlement

communications before the jury." FSS Br. at 51.  This is also not true.  First,

53

the testimony by Agba that FSS complains of did not concern a settlement offer. Instead, Plaintiff's counsel was attempting to elicit testimony from a witness as to what one of Defendant's managers, Lisa Varotsis, said about Travers. J.A. 1019:23-1020:17. The manager's statement was never part of a settlement offer. Indeed, it could not have been since it was made outside the presence of Travers and his counsel. The District Court recognized this fact when it found the so-called "settlement offer proffered by FSS – which was the subject of its Rule 408(a) objection – was not addressed to Varotsis, nor was there any evidence that she ever saw it." FSS. Add. 23. Second, a *quid pro quo* offer that Travers could get his job back if he dropped the JetBlue lawsuit was never communicated to Plaintiff's counsel or to Plaintiff himself. J.A. 1369, 1626. The August 2011 letter that Defendant cites to show the contrary simply discusses that Plaintiff would drop the lawsuit if he were reinstated, but there is no evidence that FSS ever responded to this letter or made any proposal of such to Plaintiff or his counsel. Id. Defendant can point to no such offer because none was ever made. Moreover, the letter represents a single communication made more than two and a half years prior to trial that was not written by Attorney Liss-Riordan. To suggest that counsel "did not act with candor toward the tribunal," FSS Br. at 52, is extremely misleading and suggests bad faith where none exists.

54

Finally, FSS falsely alleges that Plaintiff's counsel "knowingly advanced inadmissible evidence at trial" because Plaintiff's counsel "were the only people in the courtroom who knew that Travers' supposed conversations with Nichols occurred during a time that rendered them inadmissible." FSS Br. at 54.  This is simply not true.  As explained <u>supra</u>, Part II.C., Plaintiff's counsel believed (and continues to believe) that these comments were made while Nichols was still employed by FSS (the only scenario that makes sense since they were made "at work" and on the "curb").  The fact that Travers misspoke about the date at one point in his testimony is no reason to impute improper motives to Plaintiff's counsel or to level accusations of unprofessional conduct. J.A. 640:7-14.[21]  For all these reasons, the District Court concluded that "none of these alleged transgressions, . . . rose to the level of a sanctionable breach of professional ethics," FSS Add. at 22, and properly awarded reasonable fees to Plaintiff's counsel.  The fee award should stand.

Likewise, the District Court quickly dismissed FSS's argument that Travers should not receive attorney's fees because of his underreporting tips on his taxes. FSS Add. at 21.  The Court noted that "there is no authority that

---

[21]    Indeed, FSS counsel's making such baseless accusations is itself unprofessional.

I am aware of (and none is cited) that would punish the lawyer for the tax

defalcations of her client in a case that had nothing to do with tax issues, tax

advice, or any misrepresentation of tax matters at trial." Id.  FSS has cited no

such authority here.  Moreover, there is no reason that FSS should benefit

from Travers' underreporting by avoiding its obligation under M.G.L. c. 149

§ 150 to pay "reasonable attorney's fees."  See Sch. Comm. of Norton v.

Massachusetts Comm'n Against Discrimination, 63 Mass. App. Ct. 839, 849

(2005) (upholding decision not "to offset any unemployment benefits

received by victim of discrimination because 'if there is to be a 'windfall,'

such benefit should accrue to the injured party rather than to the

wrongdoer'").  Thus, the award should be upheld.


## VI.    The District Court Erred In Striking All Front Pay Damages In Their Entirety.

It is "consistent with Massachusetts law . . . [for] the front pay issue

[to be] submitted to the jury." Allenson v. Sch. Comm. of Norton, 66 Mass.

App. Ct. 1117 (2006), see also Walsh v. Carney Hosp. Corp., 1998 WL

1470698, *3 (Mass. Super. June 10, 1998) ("Front pay damages are to be

determined by the jury in Massachusetts"); Handrahan, 43 Mass. App. Ct. at

24 (1997).  Massachusetts case law makes clear that "the role of the district

court" is limited to "determin[ing] whether the jury's verdict is within the

confines set by state law." <u>Kelley v. Airborne Freight Corp.</u>, 140 F.3d 335,

355 (1st Cir. 1998). "Under this standard the court should examine the

evidence . . . in a light most favorable to the plaintiff." <u>Vera-Lozano v. Int'l

Broad.</u>, 50 F.3d 67, 71 (1st Cir. 1995). Thus, courts have recognized that

"[f]or the party seeking to attack the amount of jury-awarded damages, the

applicable standard of review is daunting." <u>Id.</u>

Here the District Court clearly abused its discretion by eliminating the

jury's front-pay award altogether. The record included uncontroverted

evidence that Plaintiff intended to work for FSS for "[a]nother twenty years"

and testimony from other witnesses showing that skycaps tended to stay in

their jobs for decades. J.A. 632, 703. Under the circumstances, the jury's

award of $450,000 was not "totally speculative" as the District Court

suggested. J.A. 1448. In fact, the District Court provided no basis for why

it believed the front pay was speculative and no evidence was presented to

suggest that Travers would not have continued on at FSS until retirement.[22]

---

[22]    Indeed, the evidence suggests that the jury carefully considered
Travers' age when calculating back pay, as they actually asked the judge for
his date of birth during their deliberations. The judge answered that they
would "have to rely on what [they] observed of plaintiff during trial." J.A.
1345-46. The jury did just that in calculating their front pay award. It is the
jury's province to make these sorts of determinations and the District Court
provided no reasoning as to why their observations and determinations
should not be credited.

Indeed, the jury could have determined that Travers would work for another twenty years (as he testified) and that he would have made at least $25,000 more annually in his job at FSS than as a G2 skycap for Southwest,[23] for a total of $500,000 in front pay.  It appears the jury subtracted $50,000, as the Court instructed, to account for present value of the award,[24] yielding a total of $450,000 that is precisely in line with the evidence presented at trial. Thus, the judge's determination that "there was no evidentiary support in the record to sustain a verdict of $450,000" is simply untrue, and his suggestion that the award was "wholly speculative" is incorrect.  J.A. 1448.  The jury clearly credited the testimony of Plaintiff and their "award should not be disturbed if the jury could honestly and fairly have reached" it. Walsh, 1998 WL 1470698, *4 (Mass. Super. June 10, 1998).

---

[23]     Travers testified that he typically made $200-$250 in tips per shift while working for FSS, yet only approximately $100 per shift at G2 (as a Southwest skycap), and he only worked three shifts per week at Southwest as compared with five shifts a week for FSS. J.A. 632:14-636:24.  Thus, at the low end of the spectrum, Travers was making $100 less per shift as a Southwest skycap than he made while working at FSS, such that if he worked fifty weeks a year, he lost at least $25,000 in annual income.

[24]     The District Court instructed the jury that "[i]f you do make an award of future damages, it should be reduced by as much as you believe necessary to ensure that Mr. Travers is not overcompensated as any amount awarded today to be spent in the future will earn interest in the interval" J.A. 1153.

Furthermore, courts have consistently recognized that "an award of
front pay, constituting as it does, an estimate of what a plaintiff might have
earned had s/he been reinstated at the conclusion of trial, is necessarily
speculative." Selgas v. Am. Airlines, Inc., 104 F.3d 9, 14 n. 6 (1st Cir.
1997). "Massachusetts law is clear that uncertainty in the award of future
damages does not bar their recovery, and we have said that the generousness
of a jury's award does not alone justify an appellate court in setting it aside"
Kelley, 140 F.3d at 355 (1st Cir. 1998) (internal quotation omitted); see also
Agoos Leather Cos. v. Am. & Foreign Ins. Co., 342 Mass. 603, 608 (1961)
("[w]hile damages may not be determined by mere speculation or guess …
an element of uncertainty as to the amount of damages does not bar their
recovery"). Here, the jury had to consider a number of factors,[25] and the
jury's analysis of these complex considerations should be respected and

---

[25] The types of factors juries consider include: "(1) the plaintiff's age, (2)
the length of time the plaintiff was employed by the defendant employer, (3)
the likelihood the employment would have continued absent the
discrimination, (4) the length of time it will take the plaintiff, using
reasonable effort, to secure comparable employment, (5) the plaintiff's work
and life expectancy, (6) the plaintiff's status as an at-will-employee, (7) the
length of time other employees typically held the position lost, (8) the
plaintiff's ability to work, (9) the plaintiff's ability to work for the defendant-
employer, (10) the employee's efforts to mitigate damages, and (11) the
amount of any liquidated or punitive damage award made to the plaintiff."
Ogden v. Wax Works, Inc., 29 F. Supp. 2d 1003, 1015 (N.D. Iowa 1998)
(internal citations omitted).

"upheld because it is not beyond the range supportable by proof, is not so excessive as to shock the conscience, and is not the result of a mistake." Ardingo v. Local 951, United Food And Commercial Workers Union, 333 Fed. App'x 929, 944 (6th Cir. 2009). Indeed, the "uncertain and speculative nature" of Travers' front pay damages is "a fact that is almost certainly present to some degree in any case where front pay damages are available." Id. at 943. The judge's determination that the jury's front pay award was "wholly speculative" and should be struck completely was clearly erroneous and an abuse of discretion. If anything, the judge could have remitted the amount of front pay to cover a shorter time frame, if the judge believed it was excessive. Instead, the District Court decided to "not allow the front-pay damages altogether" – a clear abuse of discretion. J.A. 1448.

Finally, the District Court's determination that front pay was speculative is out of step with numerous other decisions, upholding jury awards of front pay to plaintiffs, extending many years into the future. Haddad , 455 Mass. at 102 (affirming nineteen-year front pay award of $733,037); Weber, 434 Mass. at 763 (upholding "fifteen years of front pay damages in the amount of $546,480"); Walsh, 1998 WL 1470698, *4 (upholding a front pay award covering 25 years). In light of these cases, the jury's award here was completely supported by the evidence and should not

60

have been eliminated as speculative.  The decision to completely strike front

pay damages was an abuse of discretion and the full $450,000 jury award

should be reinstated (or at the least, some lesser, remitted amount).

**VII.  The District Court Erred in Refusing to Treble Damages for Emotional Distress (And For Front Pay, Which Should Not Have Been Eliminated).**

The District Court erred in failing to treble Travers' damages for

emotional distress and front pay (which the court erroneously struck

altogether).  Both the First Circuit and the Massachusetts Supreme Judicial

Court have made clear that since the statute's amendment in 2008, treble

damages under M.G.L. c. 149 § 150 are mandatory. See Matamoros v.

Starbucks, 699 F.3d 129, 139-40 (1st Cir. 2012) (affirming mandatory

trebling of damages awarded under amended § 150); Rosnov v. Malloy, 460

Mass. 474, 480 (2011).  M.G.L. c. 149 § 148A provides that "[n]o employee

shall be penalized by an employer in any way as a result of any action on the

part of an employee to seek his or her rights under the wages and hours

provisions of this chapter."  M.G.L. c. 149 § 150, in turn, provides that

pertinent part that "[a]n employee . . . who prevails in such an action shall be

awarded treble damages, as liquidated damages, for any lost wages and other

benefits …."  Thus, an employee who prevails in a § 148A action, alleging

he was retaliated against by an employer for asserting his Wage rights, "shall be awarded treble damages."

There is no reason these damages would not include emotional distress, as well as lost wages. For example, in Haddad v. Gonzalez, 410 Mass. 855, 868-69 (1991), the court considered trebling emotional distress damages in the context of c. 93A, and found that awarding "multiple damages for emotional distress" was consistent with legislative policy because "deterrence is an important goal of the multiple damages provisions." Given that a "mandatory award of treble damages under G.L. c. 149, § 150 [also] serves the salutary purposes of deterring employers from taking advantage of their employees …," Chiappetta v. Lyons, 1999 Mass. App. Div. 276 (Dist. Ct. 1999), it seems clear that trebling for emotional distress in the context of c. 149, § 150 is appropriate as well under the same logic. See also Fraelick v. PerkettPR, Inc., 83 Mass. App. Ct. 698, 706 (2013) ("[t]he legislative policy advanced by § 148A is clear: to encourage enforcement of the wage laws by protecting employees who complain about violations of the same"); Kelley, 140 F.3d at 356 (finding "emotional distress and front pay damages are … subject to the discretionary multiplier" under G.L. c. 151B, § 9, an analogous statute covering discrimination); Fontaine v. Ebtec Corp., 415 Mass. 309, 311 n.4 (1993) (summarily

approving the automatic doubling of damages that included both lost wages and emotional distress damages).

Trebling of emotional distress damages is also supported by the SJC's other cases broadly interpreting M.G.L. c. 149, and rejecting literalistic arguments that go against the spirit of the Wage Act. For example, in DiFiore v. American Airlines, 454 Mass. 486 (2009), the SJC rejected a literalistic interpretation of the Tips Law based upon the placement of commas that would have afforded protection to the defendant airline. Recently, in Cook v. Patient Edu. LLC, 465 Mass. 548 (2013), the SJC likewise rejected a literalistic argument that would have exempted members of LLCs (unlike officers of corporations) from individual liability under the Wage Act. And, in Awuah v. Coverall North America, Inc., 460 Mass. 484, 495, 498 (2011), the SJC took a broad reading of the phrase "damages incurred" to include insurance premiums and franchise fees that workers paid as a result of their misclassification as independent contractors.[26]

---

[26]    The District Court said it would not "blaze trails" by trebling emotional distress damages if "the SJC has not said it." J.A. 1450-51. However, the SJC has not found that emotional distress should *not* be trebled either and its other decisions interpret M.G.L. c. 149 broadly. Moreover, it is the Court's job to interpret the law and where, as here, the weight of authority indicates that cases addressing "damages incurred" under §150 should be given a broad reading, and that analogous statutes have approved trebling of emotional distress awards, the District Court erred by not trebling

Moreover, the fact that the jury had no way to award punitive damages on the verdict form, further underscores the Legislature's intent that mandatory trebling was meant as a substitute of sorts for punitive damages. See Weber v. Coast to Coast Med., Inc., 83 Mass. App. Ct. 478, 483 n. 7 (2013) (noting that an award of treble damages is punitive). Moreover, given that "[t]he legislative policy advanced by § 148A is . . . to encourage enforcement of the wage laws by protecting employees who complain about violations of the same," Fraelick, 83 Mass. App. Ct. at 706, it would make little sense to exclude emotional distress damages from § 150's mandatory trebling provision.  It seems reasonable that the Legislature intended that the right to work free from the emotional distress of unlawful retaliation (or to retain the emotional stability of ongoing employment) is an "other benefit" for purposes of § 150.  In fact, the very "purpose of the statute [is] to encourage enforcement of the wage laws by protecting employees who complain about violations of the same." Smith v. Winter Place LLC, 447 Mass. 363, 368 (2006).  For all these reasons, the award of emotional distress damages should be trebled.

---

Travers' emotional distress award (as well as the erroneously stricken front pay award).

Likewise, the District Court should have trebled the front pay damages (which it erroneously struck from the jury's award). See Kelley, 140 F.3d at 356 (finding "that emotional distress and front pay damages are [] within the definition of actual damages subject to the discretionary multiplier"). The Massachusetts legislature has provided for an employee to seek damages for retaliation under the wage laws, § 148A (enforceable through § 150), and those damages include lost front pay; moreover, the legislature has decided to require the trebling of any such damages under § 150 (which serves many purposes, including encouraging the resolution of meritorious claims prior to final judgment). Thus, there is no basis under Massachusetts law not to treble the jury's award of front pay damages to Plaintiff.

## VIII.  The District Court Erred in Failing to Award Prejudgment Interest.

The District Court erred in refusing to award Plaintiff prejudgment interest on his back pay award and emotional distress. The District Court's decision ignores that both treble damages and prejudgment interest are mandatory under Massachusetts law.[27]  See Melia v. Zenhire, Inc., 462

---

[27]    M.G.L. c. 149 § 150 provides that "[a]n employee … who prevails in such an action *__shall__* be awarded treble damages…" and M.G.L. c. 231 § 6C provides that "upon a verdict, finding or order for judgment for pecuniary damages, interest *__shall__* be added by the clerk of the court to the amount of

Mass. 164, 171 n. 8 (2012). Thus, both treble damages and prejudgment

interest must be awarded on Plaintiff's claims.[28]

Courts have found it appropriate to award prejudgment interest on

compensatory damages such as back pay and emotional distress. See, e.g.,

Bennett v. City of Holyoke, 362 F.3d 1, 11 (1st Cir. 2004) (finding on a

whistleblower claim that pre-judgment interest is available for both

economic and non-economic damages); Salvi v. Suffolk Cnty. Sheriff's

Dep't, 67 Mass. App. Ct. 596, 608 (2006) (awarding "prejudgment interest

on back pay and emotional distress awards"); Ventresco v. Liberty Mut. Ins.

Co., 55 Mass. App. Ct. 201, 211 (2002) (same); Allenson, 66 Mass. App. Ct.

1117 (2006) (finding that it was error to eliminate interest on back-pay and

emotional distress award).

Any notion that awarding prejudgment interest and treble damages is

duplicative is unfounded. First, as set forth above, both are mandatory under

their respective statutes. Second, the base award serves a compensatory

_____

damages, at the contract rate, if established, or at the rate of twelve per cent
per annum from the date of the breach or demand" (emphasis added). This
applies equally to verdicts in federal court based on state law claims. Foley
v. City of Lowell, Massachusetts, 948 F.2d 10, 17 (1st Cir. 1991).

[28]     Plaintiff sought prejudgment interest on only the single portion of the
back pay damages, not on the trebled portion. McEvoy Travel Bureau, Inc.
v. Norton Co., 408 Mass. 704, 717-18 (1990), and did not seek interest on
his front pay award. See Salvi, 67 Mass. App. Ct. at 608-09.

purpose (and therefore interest should be awarded on it) whereas the multiple damages portion serves a separate, punitive purpose.[29]  Thus, this Court has affirmed an award of both treble damages *and* prejudgment interest, awarding the interest on the base amount of compensatory damages only rather than on the trebled amount.  <u>Matamoros</u>, 699 F.3d at 133; <u>see also</u> <u>McEvoy</u>, 408 Mass. at 706; <u>DeSantis v. Commonwealth Energy Sys.</u>, 68 Mass. App. Ct. 759, 772 (2007).  Here, the District Court should have awarded interest on the base amount of damages ($90,000 in backpay and $50,000 in emotional distress).  Its failure to award any interest in this case is clearly contrary to the express language of the statutes and the case law interpreting them.[30]  This Court should correct the error and award prejudgment interest on the $140,000 in single damages.

---

[29]    Indeed, courts have recognized even after the Legislature inserted the words "liquidated damages" into § 150, that "an award of treble damages under that chapter, whether in an exercise of discretion or mandatorily, is nevertheless punitive." <u>Weber</u>, 83 Mass. App. Ct. at 478.

[30]    In its briefing below, FSS cited to federal cases that have declined to award both (discretionary) liquidated damages and interest, but these cases addressed federal rather than state statutes, which are mandatory. <u>See</u> Dkt. 155 at 6-7.

## CONCLUSION

For all of the foregoing reasons, the jury's verdict and award of $90,000 in back-pay (trebled to $270,000), $50,000 in emotional distress, and $183,583.45 in attorneys' fees and costs, should be affirmed. However, the District Court's decision to eliminate all front-pay damages, its failure to treble all damages, and its refusal to award interest, were in error and should be reversed.

Respectfully submitted,

JOSEPH TRAVERS,

By his attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (C.A.B. 77877)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts  02116
Telephone:  (617) 994-5800


Dated: November 14, 2014

**UNITED STATES COURT OF APPEALS**
**For the First Circuit**
**Appeal Nos. 14-1745, 14-1756**

_____

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

_____

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) because this brief contains 16,486 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 in Times New Roman 14 point.


/s/ Shannon Liss-Riordan
Attorney for Plaintiff-Appellee/Cross-Appellant
Dated:  November 14, 2014

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
Nos. 14-1745, 14-1756

### CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that this brief was filed through the United States Court of Appeals for the First Circuit ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including the following counsel of record for Defendant –Appellant/Cross-Appellee:

Jeffrey M. Rosin
Christopher Pardo
Constangy, Books & Smith, LLP
535 Boylston Street – Suite 902
Boston, MA 02116
Tel.    (617) 849 – 7880

*/s/ Shannon Liss-Riordan*
Attorney for Plaintiff-
Appellee/Cross-Appellant

Dated:  November 14, 2014

# ADDENDUM TABLE OF CONTENTS

Plaintiff's Motion to Amend the Judgment to Add Trebling,
      Interest, and Attorneys' Fees and Costs (Dkt. 135)  .................ADD. 1

Plaintiff's Reply in Support of His Motion to Amend the
      Judgment to Add Trebling, Interest, and Attorneys'
      Fees and Costs (Dkt. 167).......................................................ADD. 13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

JOSEPH TRAVERS,                          )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )      Civil Action No. 1:11-cv-10175-RGS
                                         )
FLIGHT SERVICES & SYSTEMS, INC.,         )
                                         )
              Defendant.                 )
_____ )

## PLAINTIFF'S MOTION TO AMEND THE JUDGMENT TO ADD TREBLING, INTEREST, AND ATTORNEYS' FEES AND COSTS

Pursuant to Rules 59(e) and 54(d)(2), Plaintiff Joseph Travers hereby moves to amend the judgment to treble the damages, add prejudgment interest, and award attorneys' fees and costs.  In support thereof, Plaintiff states as follows:

On March 7, 2014, the jury returned a verdict in Plaintiff's favor, finding that he had proved that he had been terminated in retaliation for having participated in a previous lawsuit against his employer, in violation of Mass. Gen. L. c. 149 § 148A.[1]  The jury awarded $940,000 in damages.  See Jury Verdict (Doc. 132).  As required by Mass. Gen. L. c. 149 § 150 (the statute which provides the private right of action for § 148A), the Court must now treble the damages, to bring it to a total of $2,820,000.  See Matamoros v. Starbucks, 699 F.3d 129, 139-40 (1st Cir. 2012) (affirming mandatory trebling of damages awarded pursuant to § 150, for damages incurred after statute's amendment in July 2008); Rosnov v. Malloy, 460 Mass. 474 (2011) (damages awarded

_____
[1]      The jury's verdict also found that Plaintiff had been terminated in violation of the anti-retaliation provision of the Fair Labor Standards Act ("FLSA").  Because the state law retaliation claim carries greater penalties (mandatory trebling of damages, as opposed to the federal law discretionary doubling of damages), Plaintiff will elect his remedy under state law.

pursuant to § 150 must be trebled after July 2008); <u>Bilbilian v. Morton's of Chicago/Boston, Inc.</u>, AAA Case No. 11 160 00217 (Exhibit E), at 37-41 (trebling damages awarded on retaliation claim brought under § 148A).[2]

Plaintiff also requests that prejudgment interest be entered in the final judgment at the state rate of 12% per annum from the date this case was filed in court, January 31, 2011, until the date judgment was entered, March 7, 2014. Prejudgment interest at this rate is mandatory under Mass. Gen. L. c. 231 § 6B[3], which applies to verdicts in federal court that are based on state law claims. See <u>Foley v. City of Lowell, Massachusetts</u>, 948 F.2d 10, 17 (1st Cir. 1991). Plaintiff requests prejudgment interest be added to his award of back pay ($90,000) and emotional distress ($400,000)[4], for a total of $182,280.[5]

Finally, Plaintiff seeks an award of attorneys' fees and costs for the successful prosecution of this action, also required by Mass. Gen. L. c. 149 § 150.[6] Attached here as

---

[2]     In <u>Bilbilian</u>, an arbitrator trebled the claimant's back wage award, but not emotional distress award, but in that case the claimant had not requested his emotional distress award be trebled, and that decision was issued before the Legislature amended § 150 in 2008 to require the trebling of damages awarded under that provision.

[3]     Mass. Gen. L. c. 231 § 6B provides that "[i]n any action in which a verdict is rendered . . . for pecuniary damages . . . for consequential damages . . . there *shall* be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action . . ." (emphasis added).

[4]     Prejudgment interest is awarded on emotional distress damages. See <u>Bennett v. City of Holyoke</u>, 362 F.3d 1, 11 (1st Cir. 2004) (finding on a whistleblower claim that pre-judgment interest is available for both economic and non-economic damages); <u>Salvi v. Suffolk County Sheriff's Dept.</u>, 67 Mass. App. Ct. 596, 608 (Mass. App. Ct. 2006) (awarding prejudgment interest on emotional distress award); <u>Ventresco v. Liberty Mut. Ins. Co.</u>, 55 Mass. App. Ct. 201, 211 (2002) (same). Plaintiff does not seek prejudgment interest on his award of front pay. See <u>Salvi</u>, 67 Mass. App. Ct. at 608-09.

[5]     Plaintiff calculates the prejudgment interest as follows: 3.1 years elapsed from January 31, 2011, until March 7, 2014. Interest at 12% per annum for 3.1 years equals 37.2% interest. $90,000 x 37.2% = $33,480; $400,000 x 37.2% = $148,800; the sum of the two = $182,280.

[6]     In calculating an attorney's fee award under the similar fee-shifting provision of Mass. Gen. L. c. 151B § 9, the Court considers a lodestar analysis and may also consider the following factors: how long

2

Exhibit A are billing records for Plaintiff's counsel[7], and attached as Exhibit B is an itemization of costs incurred.  Attached hereto as Exhibits C and D are affidavits from Plaintiffs' counsel Shannon Liss-Riordan and Elizabeth Tully in support of Plaintiff's request for attorneys' fees.[8]  The requested fees total $193,690, and the costs are $8,568.52.  Plaintiff's counsel submit that the requested fees are reasonable, in light of the work they have devoted to this case and the outstanding success they have achieved for the plaintiff.  Indeed, Plaintiff's counsel submits that the litigation of this case was quite efficient.  Plaintiff's counsel's firm expended just more than 500 hours on this entire litigation, which included discovery, summary judgment, an appeal to the First Circuit, and a trial.

---

the trial lasted; the difficulty of the legal and factual issues involved; the degree of competency demonstrated by the attorneys; the time and labor required; the amount of damages involved; the result obtained; the experience, reputation, and ability of the attorneys; the usual price charged for similar services by other attorneys in the same area; and the amount of awards in similar cases.  See Fontaine v. Ebtec Corp., 415 Mass. 309, 324-25 (1993).

[7]    A review of the billing records shows that Plaintiff's counsel litigated this case efficiently without expending unnecessary time and with almost no duplication of efforts by attorneys.  Only one attorney attended each deposition, and the attorneys involved in the litigation handled separate tasks with very little overlap.

[8]    The other attorneys who worked on this case include Brant Casavant, a senior associate attorney who graduated from Northeastern University School of Law in 2008, and Hillary Schwab, a partner who graduated from Columbia Law School in 1999.  Attorneys Casavant and Schwab no longer practice at Lichten & Liss-Riordan, P.C., and thus Attorney Liss-Riordan is describing their credentials in her affidavit submitted as Exhibit C.

**ADD. 3**

The breakdown of the requested fees is summarized here:

| Attorney | Rate | Hours | Total fees |
|---|---|---|---|
| Shannon Liss-Riordan | $600 | 144[9] | $86,400 |
| Elizabeth Tully | $250 | 273.7 | $68,425 |
| Brant Casavant | $300 | 71.2 | $21,360 |
| Hillary Schwab | $450 | 38.9 | $17,505 |
| | | **TOTAL** | **$193,690** |

Plaintiff's counsel request hourly rates of $600 for lead counsel Shannon Liss-Riordan, $250 for Elizabeth Tully (an associate attorney who tried the case with Attorney Liss-Riordan, and was the primary author of the appeals briefs in this matter), $300 for Brant Casavant (a senior associate who conducted most of the discovery in the case and argued the case at the First Circuit), and $450 for Hillary Schwab (a partner who conducted some discovery and assisted in overseeing discovery in the case). These rates are commensurate with other rates awarded to plaintiffs' counsel in cases dating back more than five years. See, e.g., Tuli v. Brigham & Women's Hosp., Inc., C.A. No. 07-12338 (D. Mass. Jun. 8, 2009) (five years ago, in a discrimination/retaliation case, court approved rates of $570-615 per hour for lead counsel and $630-735 per hour for senior

---

[9]    Plaintiffs' lead counsel, Shannon Liss-Riordan, kept contemporaneous billing records of her work preparing for trial and conducting the trial. She did not keep billing records for her work prior to trial, which included initiating the case, working on the complaint, and overseeing discovery, summary judgment briefing, and the appeal. Thus, the hours listed here are less than the total amount she worked on the case.

4

**ADD. 4**

partners); Brooks Automation, Inc. v. Blueshift Techs., Inc., 2006 WL 1537520
(Mass.Super. Ct. Apr. 6, 2006) (eight years ago, then Judge Gants awarded partners
rates of $500, $600, and $625 and awarded $410 to a fifth year associate).

As described further below, Attorney Liss-Riordan has been recognized generally
as one of the leading plaintiffs' lawyers in New England and nationally for her work on
behalf of employees in wage and hour litigation.  Attorney Tully graduated in 2012 from
Northeastern Law School and has been representing employees in wage and hour and
other employment litigation since graduation (and while a student at Northeastern).
Attorneys Casavant and Schwab likewise specialized in representing employees in
wage and hour matters, and other employment litigation, throughout the tenure with the
firm (since 2008 for Attorney Casavant and 2005 for  Attorney Schwab).

In the last lodestar fee award that Attorney Liss-Riordan received, which was for an
arbitration case involving findings that exotic dancers had been misclassified as
independent contractors and awarding them damages, an arbitrator awarded Attorney
Liss-Riordan $500 per hour.  See D'Antuono v. C&G of Groton, Inc., AAA No. 11-160-
02069-11 (attached here as Exhibit F).[10]  In doing so, he noted that he was bound to apply
rates applicable in Hartford, Connecticut (where the arbitration took place), see id. at 2-4,
rather than in Boston (where, the Court may note, attorney rates are higher).[11]

---

[10]    He awarded the partner who worked on the case with her $400 per hour and associates $250 per
hour.

[11]    Prior to that award, six years ago (in April 2008), Attorney Liss-Riordan was awarded a rate of $400
per hour from Judge Young in the case of DiFiore v. American Airlines, 2010 WL 623635 (D. Mass. 2010), at
*4.  However, Judge Young is somewhat known for awarding low attorneys' fees on petitions.  See Bilbilian
v. Morton's (Exhibit G), at 14-15 ("The decisions of Judge Young on attorney fee awards are decidedly
out-of-step with numerous other awards by federal and state court judges, and do not reflect the actual
fees charged by major plaintiff counsel, and certainly not be defense counsel."); see also Diaz v. Jiten

**ADD. 5**

In addition, Plaintiff's counsel, who most often prosecute cases as class actions,

earn higher effective rates than these when they settle class action cases and have fees

awarded based upon a percentage of the recovery.  See Liss-Riordan Aff. (Exhibit C), ¶

10.  In approving fee rates, the Court should recognize that the purpose behind the fee-

shifting provisions in the federal and state wage statutes is to encourage counsel to take

on meritorious wage cases, as Congress and the Massachusetts legislature recognized

that enforcing the wage laws, including the anti-retaliation provisions of those laws, is in

the public interest and is not merely a private matter.[12]

---

Hotel Management, 704 F.3d 150 (1st Cir. 2012) (First Circuit reversed Judge Young's fee award).  In making this award in DiFiore, Judge Young observed:

> Attorney Liss-Riordan is a successful and highly experienced plaintiff-side lawyer in the area of employment law, and specifically in litigation under the Massachusetts Tips Law.  Her reputation is well established as evidenced by the fact that Massachusetts Lawyers Weekly named her a lawyer of the year in 2002.

DiFiore, at *5.  In making this award, Judge Young also acknowledged that the rates he awarded were lower than those awarded by other courts.  Id., at *4.  In addition, older fee awards and affidavits demonstrate that $400 per hour is lower than market rate for a top plaintiffs' employment lawyer today.  This is the rate that was awarded to Attorney Kevin Powers nine years ago in Clifton v. MBTA, 445 Mass. 611 (2005).  See Powers Affidavit (included in Exhibit H).  This is less than the rate that Attorney Nancy Shilepsky (another high profile plaintiffs' employment attorney) stated her hourly rate was nine years ago (included in Exhibit H).  See also Affidavit of Arthur Telegen (included in Exhibit H) (an employment defense attorney, attesting that his hourly rate more than ten years ago, in 2002, was $525).

[12]    As the First Circuit has explained:

> In addition to gaining personally, successful civil rights plaintiffs serve the public interest . . . .  Moreover, some fee assessment in cases of this sort is likely to encourage more thoughtful actions by [defendants].  See Blanchard v. Bergeron, 489 U.S. 87 (1989) . . .  See also City of Riverside v. Rivera, 477 U.S. 561, 574 (1986) ("Congress has determined that 'the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff....'") (quoting Hensley, 461 U.S. at 444 n. 4 (Brennan, J., concurring in part and dissenting in part)).

Ackerley Communications of Massachusetts, Inc. v. City of Somerville, 901 F.2d 170, 171 n. 2 (1st Cir. 1990).  See also Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (purpose of fee-shifting provision in § 1988 is to ensure "effective access to the judicial process" for persons with civil rights grievances); Valley Disposal Inc. v. Cent. Vermont Solid Waste Mgmt. Dist., 113 F.3d 357, 361 (2d Cir. 1997) (noting that "[i]t is clear . . . that Congress meant not simply to allow a civil rights claimant to pursue a meritorious constitutional claim without having to pay attorneys' fees out of his own pocket, but also to encourage competent attorneys to prosecute those claims"); Fontaine v. Ebtec Corp., 415 Mass. 309, 326 (1993)

**ADD. 6**

Eight years ago, a prominent Massachusetts employment neutral, Mark Irvings (who arbitrates and mediates hundreds of labor and employment cases a year) said this about Attorney Liss-Riordan:

> She is widely recognized as one of the pre-eminent plaintiff lawyers in New England, and she is the unchallenged leader regarding wage and hour and retaliation claims in the hotel and restaurant industry.

Bilbilian v. Morton's of Chicago/Boston, Inc., AAA No. 11-160-00217-03 (Sept. 28, 2006) (Exhibit G), at 15.  Although at that time, Attorney Liss-Riordan requested a rate of only $350, since that time, as has widely been reported in the press, attorney billing rates have gone up, and as noted above and in her affidavit, Attorney Liss-Riordan now routinely receives an effective hourly rate of more than $600 per hour (and often $1,000 per hour or more) when class action cases settle.  Liss-Riordan Aff. ¶ 10.  In addition, since that arbitration award, and the DiFiore trial in 2008, Attorney Liss-Riordan's recognition as a national expert on wage and hour litigation has increased.  Each year since 2008, she has been selected for inclusion in Best Lawyers in America (Chambers).  Liss-Riordan Aff. ¶ 5; Exhibit I.[13]  She has also been listed each year

---

("The statutory provision for attorney's fees aims to attract competent legal counsel for those with meritorious claims").

Moreover, it is important to recognize that management side attorneys are paid for their time on an hourly basis, win or lose.  In contrast, employee-side lawyers who represent clients on a contingency basis are only paid if they succeed.  Thus, the rates they are awarded should recognize this risk.  For instance, Plaintiff's counsel's firm, which works almost exclusively on a contingency basis spent more than five years, and thousands of hours, on a series of cases representing skycap employees challenging airlines' failure to remit to them proceeds of $2 per bag charges for curbside check-in that customers mistook for tips.  Despite having won these claims at trial and on appeal to the Massachusetts Supreme Judicial Court, see DiFiore v. American Airlines, 454 Mass. 486 (2009), thousands of hours of time went uncompensated when the First Circuit reversed the judgment based upon a finding of federal preemption.  See DiFiore v. American Airlines, 646 F.3d 81 (1st Cir. 2011); Brown v. United Airlines, 720 F.3d 60 (1st Cir. 2013), consolidated with Mitchell v. US Airways, 858 F.Supp.2d 137 (D.Mass. 2012).

[13]    The 2013 edition of Chambers lists Lichten & Liss-Riordan, P.C. as one of only four plaintiff-side employment law firms cited from Massachusetts and said this about Attorney Liss-Riordan:

**ADD. 7**

since 2008 by the Boston Globe Magazine as one of "Boston's Best Lawyers".  Liss-

Riordan Aff. ¶ 5.  In 2009, she was included on "The Power List", Massachusetts

Lawyers Weekly's "roster of the state's most influential attorneys" (which described her

as a "[t]enacious class-action plaintiffs' lawyer [who] strikes fear in big-firm employment

attorneys throughout Boston with her multi-million-dollar victories on behalf of strippers,

waiters, skycaps and other non-exempt employees."). Liss-Riordan, Aff. ¶ 5.  In

December 2012, the Boston Globe published a profile of Attorney Liss-Riordan,

highlighting her groundbreaking successes on behalf of low wage workers.  See

"Lawyer Fights for Low Wage Workers' Rights", Boston Globe (Dec. 23, 2012) (Exhibit

J).[14]  See also  "The worker's champion: Shannon Liss-Riordan represents cab drivers,

baristas, exotic dancers, and waiters in class action lawsuits", Commonwealth

Magazine (July 15, 2013) (Exhibit L).

Indeed, over the last dozen years, Plaintiff's counsel, Attorney Shannon Liss-

Riordan, has successfully represented waitstaff and service employees in dozens of

cases.  She has taken three tips cases to trial and has won all three before juries:  See

Calcagno v. High Country Investor, Inc., d/b/a Hilltop Steak House, Essex Civ. A. No.

03-0707 (Mass. Super. 2006) (employer violated Tips Law by not paying out full

proceeds of service charges to waitstaff employees); Benoit et al. v. The Federalist,

---

**KEY INDIVIDUALS  Shannon Liss-Riordan** is considered a leader of the wage and hour litigation Bar, where she is described by peers as *"the reigning plaintiff's champion."* She has a nationwide practice, and is highly experienced in cases involving tipped employees.

Exhibit I.

[14]      This was the second profile The Boston Globe published on Attorney Liss-Riordan's work.  The first, published in 2008, is attached here as Exhibit K.  See Jonathan Saltzman, "Skycaps and waiters find a legal champion," Boston Globe, April 29, 2008.

**ADD. 8**

Inc., Suffolk Civ. A. No. 04-3516 (Mass. Super. 2007) (employer violated Tips Law by

not paying out full proceeds of service charges to waitstaff employees); and DiFiore v.

American Airlines, Inc., Civ. A. No. 07-10070 (D. Mass. 2008) (skycaps should have

received proceeds of $2 per bag charge for curbside check-in because passengers

reasonably believed it was their tip), reversed on federal preemption grounds, 646 F.3d

81 (1st Cir. 2011).  She has also handled four tips cases on appeal in Massachusetts, all

of which she has won: Matamoros v. Starbucks Corp., 2011 WL 1044654, adopted by

2011 WL 1002740 (D. Mass. 2011), affirmed by 699 F.3d 129 (1st Cir. 2012) (Starbucks

violated Massachusetts Tips Law by including shift supervisors in the tip pool); Cooney

v. Compass Group Foodservice, 69 Mass. App. Ct. 632 (2007) (holding "service

charges" to be required to be distributed to waitstaff employees, regardless of customer

intent, and rejecting defense that defendant could receive credit against damages due

to higher hourly rate paid to waitstaff); Bednark v. Catania Hospitality Group, Inc., 78

Mass. App. Ct. 806 (2011) (holding that "administrative fees" may be service charges

under the Tips Law, if customers would reasonably believe they are gratuities for the

waitstaff); DiFiore v. American Airlines, Inc., 454 Mass. 486 (2009) (holding that

skycaps could prevail on Tips Law claim even though airline was not their direct

employer).[15]

---

[15]     Other cases that Attorney Liss-Riordan has successfully litigated at trial include: Bradley et al. v.
City of Lynn et al., 443 F.Supp.2d 145 (D. Mass. 2006) (verdict for plaintiff class where federal court held
following bench trial that Commonwealth's entry level firefighter hiring examination has disparate impact
on minorities and violated Title VII); Collins v. Commonwealth, (Mass. Super. Court 2007) (jury verdict in
favor of state police trooper who had been disqualified from employment because of his kidney
transplant); Bingham v. Lynn Sand & Stone, 93-BEM-1491 (MCAD 2003) (finding of discrimination by
MCAD after public hearing that company failed to hire African American truck driver applicant because of
his race); Hernandez v. Winthrop Printing Co. (Suffolk Superior Court 2002) (jury verdict in favor of Native
American/Mexican plaintiff who was terminated in retaliation for complaining of race discrimination);
Sprague v. United Airlines, Inc., 2002 WL 1803733 (D. Mass 2002) (judgment of $1.1 million in a
discrimination case brought by deaf airline mechanic who had been denied employment based on

9

Attorney Liss-Riordan has also obtained significant first-of-their-kind victories in cases challenging independent contractor misclassification for cleaning workers in claims brought against cleaning franchise companies[16], and has also been significantly involved in litigation challenging the misclassification of delivery drivers[17]. Attorney Liss-Riordan has also litigated precedent-setting cases on behalf of other misclassified workers in other industries, including on behalf of exotic dancers[18] and cab drivers.[19] She has successfully litigated groundbreaking appeals in Massachusetts wage and hour law, and Massachusetts employment law more generally.[20] Her appellate work has extended

---

disability); Dahill v. Boston Police Department, 434 Mass. 233 (2001) (Supreme Judicial Court decided that Massachusetts law would diverge from federal law in prohibiting discrimination against individuals with correctable disabilities, resulting in hiring of hearing-impaired police officer candidate and jury verdict of $850,000).

[16]     See Awuah et al. v. Coverall North America, Inc., 707 F. Supp. 2d 80 (D. Mass. 2010) (holding cleaning worker "franchisees" to have been misclassified as independent contractors), and Awuah et al. v. Coverall North America, Inc., 460 Mass. 484, 497-99 (2011) (establishing the damages awardable for the misclassification, including refunds of "franchise fees"); De Giovanni et al. v. Jani-King International, Inc. et al., De Giovanni v. Jani-King Int'l, Inc., C.A. No. 07-10066-MLW (D. Mass. June 6, 2012) (also holding cleaning worker "franchisees" to have been misclassified as independent contractors); Depianti et al v. Jan-Pro Franchising International, Inc., 465 Mass. 607 (2013) (holding that national company could not evade liability for independent contractor misclassification by virtue of it not having direct contracts with the workers).

[17]     See, e.g., Schwann et al v. FedEx Ground Package System, Inc., C.A. No. 11-cv-11094-RGS (D. Mass. July 3, 2013) (granting plaintiffs' motion for summary judgment, holding FedEx drivers to have been misclassified as independent contractors).

[18]     See, e.g, Chaves v. King Arthur's Lounge, Inc., Suffolk C. A. No. 07-2505 (Mass. Super. Jul. 30, 2009) (granting summary judgment and class certification to exotic dancers on their misclassification claim).

[19]     See Farah et al. v. Tutunjian et al, Suffolk C.A. No. 12-3430 (Mass. Super. June 27, 2013) (finding plaintiff cab drivers likely to succeed on the merits of their claim that they were misclassified as independent contractors and granting injunction against the defendants' transfer of more than $200 million in assets outside the ordinary course of business).

[20]     See, e.g., Depianti et al v. Jan-Pro Franchising International, Inc., 465 Mass. 607 (2013) (Massachusetts Supreme Judicial Court (SJC) held that national company could not evade liability for independent contractor misclassification by virtue of it not having direct contracts with the workers); Taylor v. Eastern Connection Operating, Inc., 465 Mass. 191 (2013) (SJC held Massachusetts independent contractor law applicable to work performed in New York for Massachusetts company); Matamoros v. Starbucks Corp., 699 F.3d 129 (1st Cir. 2012) (holding that Starbucks violated Massachusetts Tips Law by allowing shift supervisors to share in tip pool); Awuah et al. v. Coverall North America, Inc., 460 Mass.

**ADD. 10**

beyond Massachusetts.  See, e.g., Villon et al. v. Marriott, 306 P.3d 175 (Haw. 2013) (Hawaii Supreme Court determined that waitstaff employees can bring claims for service charges that are not distributed to waitstaff, pursuant H.R.S. § 481B-14).

In this case, Attorney Elizabeth Tully performed the majority of hours of work. She did so under the direction of Attorney Liss-Riordan, and she and Attorney Liss-Riordan were able to draw from the wealth of experience that Lichten & Liss-Riordan, P.C. have developed in the area of tipped employees, wage law complaints, and retaliation claims.  Attorney Liss-Riordan's national prominence in this field, breadth of experience, and success in litigating employment misclassification cases should be reflected by an hourly rate of $600.  Commensurate with fee awards noted above for other plaintiffs' attorneys in this area, the Court should award a rate of $250 per hour for Attorney Tully, the associate attorney who performed the most hours on the case (including drafting the appeal briefs and second chairing Attorney Liss-Riordan at trial), $300 per hour for associate attorney Brant Casavant (who conducted the majority of

---

484 (2011)  (SJC established the damages awardable for independent contractor misclassification under Massachusetts law, finding it to violate Massachusetts wage law and public policy to charge employees for a job); DiFiore v. Am. Airlines, Inc., 454 Mass. 486 (2009) (SJC held airline liable for Tips Law violation despite fact that skycap employees were directly employed by an intermediary company), rev'd on federal preemption grounds, 646 F.3d 81 (1st Cir. 2011), cert. denied, 132 S. Ct. 761 (2011); King et al. v. City of Boston, 71 Mass.App.Ct. 460 (2008) (Appeals Court reversed grant of summary judgment in sex discrimination suit, finding that plaintiffs could show that Boston Police Department discriminated against female superior officers by not providing them with separate locker rooms); Skirchak et al. v. Dynamics Research Corporation, 508 F.3d 49 (1st Cir. 2007) (First Circuit struck down class arbitration waiver in employer's arbitration policy); Cooney et al. v. Compass Group Foodservice, et al., 69 Mass.App.Ct. 632 (2007) (Appeals Court held that servers were entitled as a matter of law to receive proceeds of service charges added to function bills); Gasior v. Massachusetts General Hospital, 446 Mass. 645 (2006) (SJC determined that discrimination claims, including claims for punitive damages, survive the plaintiff's death); Smith et al. v. Winter Place LLC d/b/a Locke-Ober Co., Inc., 447 Mass. 363 (2006) (SJC held employees engaged in protected activity by making internal complaints of wage violations); Dahill v. Boston Police Department, 434 Mass. 233 (2001) (Supreme Judicial Court decided that Massachusetts law would diverge from federal law in prohibiting discrimination against individuals with correctable disabilities, resulting in hiring of hearing-impaired police officer candidate and jury verdict of $850,000).

**ADD. 11**

discovery in this case), and $450 per hour for Hillary Schwab (a partner who performed some, and assisted in overseeing, discovery in this case).

For the reasons described above, the requested fees and costs were reasonably incurred by counsel in prosecuting this case successfully for Plaintiff Joseph Travers. Plaintiff thus respectfully requests that this Court amend the judgment to include trebling of the verdict (for a total of $2,820,000), prejudgment interest ($182,280), attorneys' fees ($193,690), and costs ($8,568.52), for a total of $3,204,538.52.

Respectfully submitted,

JOSEPH TRAVERS,
By his attorneys,

   /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, BBO #666029
Elizabeth Tully, BBO #685855
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
617-994-5800

Dated: March 17, 2014


**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2014, a copy of this document was served by electronic filing on all counsel of record.

   /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.

**ADD. 12**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
JOSEPH TRAVERS,                             )
                                            )
              Plaintiff,                    )
                                            )
       v.                                   )        Civil Action No. 1:11-cv-10175-RGS
                                            )
FLIGHT SERVICES & SYSTEMS, INC.,            )
                                            )
              Defendant.                    )
_____     )


### PLAINTIFF'S REPLY IN SUPPORT OF HIS
### MOTION TO AMEND THE JUDGMENT TO ADD TREBLING,
### INTEREST, AND ATTORNEYS' FEES AND COSTS

### [LEAVE TO FILE GRANTED APRIL 18, 2014]

       In its opposition to Plaintiff's Motion to Amend the Judgment to Add Trebling,

Interest, and Attorneys' Fees and Costs (Doc. 135), FSS has raised a number of

arguments to which Plaintiff replies below.

**I.     The jury's front pay award should stand**

       FSS's argument that this Court should eliminate the front pay award fails for

several simple reasons.[1]

       First, with respect to FSS's argument that the Court should set aside the front

pay award, FSS argues that it is within the Court's discretion whether front pay should

be allowed, that is, that this is an issue for the Court, rather than for the jury.  The

_____

[1]       Notably, FSS makes its request that the front pay award be eliminated in response to Plaintiff's
request for trebling under the Wage Act, rather than moving in its Renewed Motion for Judgment as a
Matter of Law, or, In the Alternative, Motion for a New Trial or to Amend the Judgment (Doc. 152), to
eliminate this portion of the award.  Having failed to file a motion seeking elimination of the jury's front pay
award based on the Wage Act's mandatory treble damages provision, Plaintiff notes that FSS has waived
this argument.  Plaintiff responds to FSS's argument in the event that the Court nevertheless considers it.

problem for FSS is that it never objected to the front pay question going to the jury.

Thus, FSS waived any argument that front pay should be a matter for the Court to

decide, rather than an issue for the jury.  See Trainor v. HEI Hospitality, LLC, 699 F.3d

19, 31 n. 3 (1st Cir. 2012).

FSS's suggestion that the Court can eliminate the front pay award in its equitable

discretion because it is a substitute for reinstatement falters because FSS has never

requested that Plaintiff be reinstated and, as the Massachusetts Supreme Judicial Court

has held, "the plaintiff's duty to mitigate [does not] require[] the plaintiff to make a

request for reinstatement as a prerequisite to a claim for front pay."  Conway v. Electro

Switch Corp., 402 Mass. 385, 390 (1988).  The fact that FSS never offered to reinstate

Plaintiff and the front pay issue was allowed to go to the jury (without objection by FSS)

makes it unnecessary for the Court to exercise equitable discretion regarding going-

forward relief.

Second, FSS relies on federal law regarding its argument that front pay is

discretionary, and thus should be eliminated by the Court in order to avoid over-

compensation to the plaintiff.  In contrast to federal law, however, Massachusetts law is

much stronger in ensuring compensation to employees who have been harmed by

companies' violation of the wage laws, which includes the anti-retaliation provision of

the wage laws, § 148A.  Unlike some federal courts interpreting the FLSA, the

Massachusetts Supreme Judicial Court and Appeals Court have rejected arguments

that wage-related judgment would create "windfalls" for plaintiffs.  See Somers v.

Coverged Access, Inc.,  454 Mass. 582, 592 (2009) (rejecting employer's "windfall"

argument because "[t]he 'windfall' the Legislature appeared most concerned with is the

**ADD. 14**

'windfall' that employers enjoy from" violating the Wage Act); Cooney v. Compass

Group Foodservice, 69 Mass. App. Ct. 632 (2007) (rejecting employer's argument that

not giving the employer credit for a higher pay rate would create a windfall for the

plaintiffs).

Finally, the First Circuit expressly rejected the argument that a treble damages

award renders an award of front pay inappropriate in Trainor v. HEI Hospitality, LLC,

699 F.3d 19 (1st Cir. 2012).  The First Circuit explained that this is because:

> the purposes of front pay and multiplied damages are so disparate that a
> per se rule of mutual exclusivity makes no sense.  The purpose of a front
> pay award is to help to make a plaintiff whole.  Lussier, 50 F.3d at 1112
> n.10.  Conversely, multiplication of damages, at least under Mass. Gen.
> Laws ch. 151B, § 9, is "essentially punitive in nature."  Fontaine v. Ebtec
> Corp., 415 Mass. 309, 613 N.E.2d 881, 889 (Mass. 1993) (internal
> quotation marks omitted).  In other words, the multiplication factor is
> meant to punish the wrongdoer for egregious conduct.  It follows that
> there is no principled basis to bar front pay simply because multiplied
> damages are in prospect.

Trainor, 699 F.3d at 31.  And there is no difference between the nature of the multiple

damages provisions in Mass. Gen. Laws ch. 151B, § 9 and Mass. Gen. Laws ch. 149, §

150, for as the Massachusetts Appeals Court recently held in Weber v. Coast to Coast

Med., Inc., 83 Mass. App. Ct. 478 (2013), "an award of treble damages [under Mass.

Gen. Laws ch. 149, § 150], whether in an exercise of discretion or mandatorily, is

nevertheless punitive."  See also Goodrow v. Lane Bryant, Inc., 432 Mass. 165, 178-

179, 732 N.E.2d 289 (2000); DeSantis v. Commonwealth Energy Sys., 68 Mass. App.

Ct. 759, 768, 864 N.E.2d 1211 (2007).  Accordingly, under Trainor, the Court must

reject FSS's argument that mandatory treble damages moots the jury's award of front

pay.

## II.    The front pay award should be trebled

**ADD. 15**

With respect to its argument that the Court should, in its discretion, not award treble damages for the front pay award, FSS erroneously relies on the wrong law, namely federal law under the FLSA.  While FSS is correct that the standard for awarding liquidated damages under the FLSA is discretionary with the Court, Plaintiff's request for treble damages rests on state law, Mass. Gen. L. c. 149 § 150.  Both the First Circuit and the Massachusetts Supreme Judicial Court have made clear that treble damages under § 150, since the statute's amendment in 2008, are <u>mandatory</u>, not within the courts' discretion.  <u>See</u> <u>Matamoros v. Starbucks</u>, 699 F.3d 129, 139-40 (1st Cir. 2012) (affirming mandatory trebling of damages awarded pursuant to § 150, for damages incurred after statute's amendment in July 2008); <u>Rosnov v. Malloy</u>, 460 Mass. 474 (2011) (damages awarded pursuant to § 150 must be trebled after July 2008).[2]

Here, front pay was properly submitted to the jury, and for the reasons described in Plaintiff's Opposition to FSS's Renewed Motion for Judgment as a Matter of Law (Doc. 163), the front pay award was amply supported by the evidence.  The Massachusetts legislature has seen fit to provide a cause of action for an employee to seek damages for retaliation under the wage laws, § 148A (enforceable through § 150), and those damages include lost front pay; moreover, the legislature has decided to require the trebling of any such damages under § 150 (which serves many purposes, including encouraging the resolution of meritorious claims prior to final judgment). Thus, there is no basis under Massachusetts law not to treble the jury's award of front pay damages to Plaintiff.

---

[2]    <u>See also</u> <u>Kelley v. Airborne Freight Corp.</u>, 140 F.3d 335, 357 (1st Cir. 1998) (multiplying front pay award because, "[i]n Massachusetts, front pay is compensatory in nature").

**ADD. 16**

III.     **The emotional distress damages should be trebled**

      FSS's argument that emotional distress damages for a retaliatory discharge in

violation of Mass. Gen. Laws c. 149 § 148A should not be trebled since such damages

are not "wages or other benefits" is too cramped a reading of Mass. Gen. Laws c. 149 §

150.  Time and again, the Massachusetts Supreme Judicial Court has rejected overly

"literalistic" arguments that would create an "end run" around the protections afforded to

employees by the wage laws.  For example, in DiFiore v. American Airlines, 454 Mass.

486 (2009), the SJC rejected an overly literalistic interpretation of the Tips Law based

upon the placement of commas that would have afforded protection to the defendant

airline.  More recently, in Cook v. Patient Edu. LLC, 465 Mass. 548 (2013), the Supreme

Judicial Court likewise rejected an overly literalistic argument that would have exempted

members of LLCs (unlike officers of corporations) from individual liability under the

Wage Act.  And, in Awuah v. Coverall North America, Inc., 460 Mass. 484 (2011), the

Supreme Judicial Court took a broad reading of the phrase "damages incurred".

      As noted earlier, the First Circuit and Massachusetts Supreme Judicial Court

have made clear that treble damages are, since 2008, mandatory for Wage Act

violations (including violations of all provisions encompassed within the private right of

action provision, § 150).  See Matamoros v. Starbucks, 699 F.3d at 139-40; Rosnov v.

Malloy, 460 Mass. 474.  Plaintiff is confident that the Supreme Judicial Court would

likewise reject the argument that only certain types of Wage Act damages--and not

emotional distress damages--are subject to trebling.  Mass. Gen. L. c. 149 § 148A

**ADD. 17**

provides: "No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter."  Obviously, firing an employee for participating in a lawsuit alleging that his employer violated the Wage Act runs afoul of this provision.  Mass. Gen. L. c. 149 § 150, in turn, provides in pertinent part that "[a]n employee claiming to be aggrieved by a violation of section[] … 148A … may … institute and prosecute in his own name … a civil action for … any damages incurred.  …  An employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits …."  Equally obviously, § 150 permits the recovery of emotional distress damages for a retaliatory discharge.  And "[t]he legislative policy advanced by § 148A is clear: 'to encourage enforcement of the wage laws by protecting employees who complain about violations of the same.'"  Fraelick v. PerkettPR, Inc., 83 Mass. App. Ct. 698, 706 (2013) (quoting Smith v. Winter Place LLC, 447 Mass. 363, 368 (2006)).

Given this legislative purpose, it would make little sense to exclude emotional distress damages from § 150's mandatory trebling provision.  Moreover, it is perfectly reasonable to believe that the Legislature intended that the right to work free from emotional distress (or to retain the emotional stability of ongoing employment) is an "other benefit" for purposes of § 150.  This is especially so where FSS's argument would effectively render employees who are fired for exercising their rights under the Wage Act with less protection than an employee whose wages were unlawfully detained.  "Such outcomes would directly contravene the purpose of the statute, to

6

**ADD. 18**

encourage enforcement of the wage laws by protecting employees who complain about violations of the same." Smith v. Winter Place LLC, 447 Mass. 363, 368 (2006).

Finally, given that § 150 provides for mandatory treble damages, rather than allowing an option for the jury to decide on an amount of punitive damages, it is particularly appropriate to conclude that the legislature intended trebling of <u>all</u> damages awarded under § 150. In this case, the jury had no space on the verdict form to fill in an amount of punitive damages, and the Court can infer that the Legislature provided for treble damages so as to replace that option. Thus, the Court should treble the emotional distress damages, as well as all the other damages awarded by the jury.

## IV.    Plaintiff is entitled to prejudgment interest on the back pay award[3]

Defendant's argument that Plaintiff is not entitled to prejudgment interest on his back pay award ignores the fact that <u>both</u> treble damages and prejudgment interest are mandatory under Massachusetts law. The Wage Act specifically provides that "[a]n employee … who prevails in such an action ***shall*** be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees." Mass. Gen. L. c. 149 § 150 (emphasis added). Likewise, Mass. Gen. Laws c. 231 § 6C provides that "upon a verdict, finding or order for judgment for pecuniary damages, interest ***shall*** be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand"

---

[3]    As noted in footnote 1 of its opposition, "FSS does not contest Plaintiff's right to prejudgment interest on any emotional distress award." Doc. 155 at 7, n. 1.

(emphasis added).  Thus, both treble damages and prejudgment interest must be awarded on Plaintiffs' claims.[4]

Indeed, in Matamoros v. Starbucks Corp., 699 F.3d at 133, a class of employees prevailed under the Massachusetts Tips Law, and the First Circuit affirmed the judgment, which "trebled the damages that accrued and included "prejudgment interest at a rate of 12% per annum."  See also DeSantis v. Commonwealth Energy Sys., 68 Mass. App. Ct. 759, 772 (2007) (affirming award of treble damages on Wage Act claim and revising but upholding an award of prejudgment interest); Scott v. Boston Housing Auth., 2003 Mass. Super. LEXIS 243 (July 14, 2003) (awarding prejudgment interest on multiple damage award).  Likewise, this Court should award both prejudgment interest and treble damages here, since both are mandatory under their respective statutes.  Melia v.Zenhire, Inc., 462 Mass. 164, 171 n. 8 (2012) (recognizing that the Legislature "made the treble damages mandatory" for a violation of the Wage Act); Garland v. Compuserve, Inc., 1993 WL 131447 at *20 (D. Mass. Apr. 26, 1993) (finding that "the plain meaning of the statutory language [of Mass. Gen. L. c. 231 §§ 6B and 6C] is mandatory, not discretionary" with respect to the dates from which interest is to be added).  Thus, any suggestion that Plaintiff is not entitled to both treble damages and prejudgment interest is without merit.

Defendant's argument that the words "liquidated damages" in Mass. Gen. Laws c. 149 § 150 require otherwise exalts form over function.  Defendant concedes that "[i]f, under … the Massachusetts Wage Act, liquidated damages were punitive in nature, 'a recovery of prejudgment interest on compensatory damages and of multiple or

---

[4]     As noted in his motion, Plaintiff seeks prejudgment interest on only the single portion of the backpay damages, not on the trebled portion.

**ADD. 20**

liquidated damages is not duplicative.'" Doc. 155, at 7 (quoting Feygina v. Hallmark Health Sys., Inc., 2013 WL 3776929 (Mass. Super. July 12, 2013). But Massachusetts' courts have long held that multiple damages under § 150 are punitive rather than compensatory. See Goodrow v. Lane Bryant, Inc., 432 Mass. 165, 178-179 (2000); DeSantis v. Commonwealth Energy Sys., 68 Mass. App. Ct. 759, 768 (2007). As discussed above, the Massachusetts Appeals Court has recognized, even after the Legislature inserted the words "liquidated damages" into § 150, "an award of treble damages [under Mass. Gen. Laws ch. 149, § 150], whether in an exercise of discretion or mandatorily, is nevertheless punitive." Weber v. Coast to Coast Med., Inc., 83 Mass. App. Ct. 478 (2013).[5] Accordingly, Plaintiff is entitled to prejudgment interest on his back pay award.

## V.   Plaintiff's application for attorneys' fees should not be reduced

The bevy of complaints FSS offers about Plaintiff's application for attorneys' fees does nothing to show that the fees requested should be reduced. Indeed, Plaintiff submits that the fee request is quite reasonable, given the amount of litigation that has gone into this case (including discovery, summary judgment, appeal, and trial), and given the excellent result obtained.

First, FSS's arguments about "tax fraud" and "unclean hands" are, simply, irrelevant. See Atlantic Limousine, Inc. v. NLRB, 243 F.3d 711 (3rd Cir.2001); Am. Legion Post 12 v. Susa, 2005 WL 3276210 (R.I. Super. Ct. Nov. 30, 2005). Cf. Mori-Noriega v. Antonio's Rest., Inc., 923 F.2d 839 (Table) (1st Cir. 1990) (unpublished) (district court properly relied on a plaintiff's testimony about his tip income, instead of his

---

[5]     Of course, Weber, as a decision by the Massachusetts Appeals Court, renders the Superior Court judge's decision in Feygina on whether the mandatory treble damages provision is compensatory or punitive a nullity.

ADD. 21

tax returns, in calculating lost wages because "[w]hile it is obviously wrong not to report tips as income, this is not an income tax case.  And, we are aware of no rule of law that prevents a judge from accepting the plaintiff's account of his actual, higher earnings, as true.").  This is especially true since any judgment he receives will be taxable, and FSS's position effectively asks this Court to allow it to profit from its wrong to Travers without Travers having wronged FSS at all.  In any event, under Massachusetts law, an employee who proves that an employer violated the wage laws "shall" be entitled to award of "the costs of litigation and reasonable attorney's fees."  Mass. Gen. L. c. 149 § 150.  This language mandates an award of fees to Plaintiff, because he prevailed in his claim that FSS violated the anti-retaliation provision of Massachusetts' wage laws (and indeed was awarded damages for this violation).

Second, FSS's claim that this "simple" case did not merit four lawyers working on it ignores the fact that only two lawyers were working on it at a time.  Despite FSS's belief that Plaintiff is seeking fees for time spent "getting up to speed" on the case, even a cursory review of the billing records shows that this is not the case.  Indeed, as the billing records and Attorney Liss-Riordan's affidavit also make clear, she is not requesting fees for her own work for any time prior to February 2, 2014, when she began preparing to try the case, even though this case began on September 7, 2010, and she was lead counsel from its inception (overseeing discovery, summary judgment briefing, and the appeal, for which  she has not submitted hours to be reimbursed).  Moreover, the case was litigated extremely efficiently, with only 527 hours being billed for a case that went through full discovery, summary judgment, appeal, and trial.  If FSS believes this amount of hours is excessive, it should produce its attorneys' billing

**ADD. 22**

records to show how much time they billed to this case.  See Mulhearn v. Roach, 20

Mass. App. Ct. 322 (1985) (finding direct comparison between parties' billing practices

"highly relevant").

Third, FSS's objection to Attorney Liss-Riordan's billable rate is nothing more

than an unwarranted *ad hominem* attack that smacks of sour grapes.  FSS does not

dispute that $600 an hour is a reasonable and proper rate for an attorney of Ms. Liss-

Riordan's experience, reputation, and ability.  Instead, FSS launches curious attacks on

her alleged behavior during trial (for which it has not provided support for why such

attacks would merit a reduction in the fee rate).  In any event, the Court can draw its

own conclusions regarding Attorney Liss-Riordan's performance during trial.  This case

covered more than a three-year period and was tried over five days.  During trial (a trial

for which the original judge believed that "no reasonable jury" could find in plaintiff's

favor), Attorney Liss-Riordan presented the issues so clearly and persuasively that the

jury came back with its verdict in Plaintiff's favor and awarded damages of close to $1

million dollars.  In short, FSS offers no reason why Attorney Liss-Riordan's rate is too

high, while Plaintiff, by contrast, has offered ample authority to support Attorney Liss-

Riordan's rate.  See, e.g., Tuli v. Brigham & Women's Hosp., Inc., No. 07-12338, at 3-4

(D. Mass. Jun. 8, 2009) (approving rates of $570-615 per hour for in a case involving

claims of discrimination and retaliation).

## VI.    The challenged costs are taxable

FSS's argument that certain costs relating to depositions and subpoenas for

witnesses who did not testify at trial tries to apply a rule that sweeps far too broadly.

Plaintiff did not know until the last day of trial whether Lisa Varotsis would be called as a

**ADD. 23**

witness or her deposition transcript read into evidence.  The same is true of the

deposition transcripts of Moises Jackson and Abdelati Ennakori, as well as the

subpoena costs for Jackson, Erik Maltby (who had already been subpoenaed by the

time the Court excluded him from the witness list), Randolph Trim, and Robert Nichols

(for whom Plaintiff attempted to get him under subpoena for trial testimony to be taken

by video).  See, e.g., Electronic Specialty Co. v. Int'l Controls Corp., 47 F.R.D. 158

(S.D.N.Y. 1969) (holding that a deposition that is not used at trial is still taxable in favor

of the prevailing party if it appears to be reasonably necessary to the parties in the light

of a particular situation existing at the time it was taken; the fact that the deposition is

not received in evidence at the trial does not necessarily prevent the taxation of its

cost).  See also Wright & Miller, 10 Fed. Prac. & Proc. Civ. § 2676 (3d ed. 2013) ("When

a deposition is not actually used at trial or as evidence on some successful preliminary

motion, whether its cost may be taxed generally is determined by deciding if the

deposition reasonably seemed necessary at the time it was taken.").

## CONCLUSION

For the reasons discussed herein and in his motion, the Court should amend the

judgment to add trebling, interest, and attorneys' fees and costs, and reject FSS's

arguments to eliminate damages and not to amend the judgment as Plaintiff has

requested.

**ADD. 24**

Respectfully submitted,

JOSEPH TRAVERS,
By his attorneys,

___/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, BBO #640716
John E. Duke, BBO #658755
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
Dated: April 18, 2014            617-994-5800

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2014, a copy of this document was served by electronic filing on all counsel of record.

___/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, Esq.

**ADD. 25**